File Name: 05a0291n.06
Filed: April 18, 2005

No. 04-1107

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| DIGITAL 2000, INC., a Michigan Corporation, JOHN WISNIEWSKI, an individual, and JOEL POPA, an individual, | ) ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF |
| Plaintiffs-Appellants, | ) ) | MICHIGAN (No. 02-74877) |
| v. | ) ) | |
| BEAR COMMUNICATIONS, INC., a California corporation, doing business in Michigan, | ) ) ) | |
| Defendant-Appellee. | ) | |

BEFORE:    BOGGS, Chief Judge; MARTIN, Circuit Judge; and GWIN, District Judge.[*]

Gwin, District Judge:

With this appeal, Plaintiffs-Appellants Digital 2000, Inc., John Wisniewski, and Joel Popa

challenge the district court's decision granting summary judgment to Defendant-Appellee Bear

Communications, Inc. on the Plaintiffs' claims for (1) breach of contract, (2) unjust enrichment, and

---

[*] The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

-1-

(3) equitable accounting. The Plaintiffs generally allege that the Defendant breached a November 1, 1999 "Assignment, Assumption, and Consent Agreement" and an oral acquisition agreement between the two companies. Principally, the Plaintiffs say the Defendant agreed to assume certain liabilities, but has failed to do so.

The Assignment Agreement and the purported oral agreement emerged as part of a transaction in which Defendant BearCom negotiated to purchase certain assets and liabilities of Plaintiff Digital. The parties disagree over the range of assets and liabilities covered by the Assignment Agreement, and whether the parties reached an additional oral agreement. The district court granted summary judgment to the Defendants on all claims. For the reasons that follow, we **AFFIRM IN PART AND REVERSE IN PART** the decision of the district court.

I. Background

*A. The Parties*

Plaintiffs John Wisniewski and Joel Popa incorporated Digital on June 18, 1998. Wisniewski and Popa are former Nextel Communications employees who went into business for themselves as authorized dealers for Nextel. In addition to Nextel, Digital was an authorized dealer for other cellular telephone providers, including LDMI, OMNI Point, Sprint PCS, AT&T Wireless, and Page Net. Under the terms of its August 1998 Authorized Independent Sales Representative Agreement with Nextel (the "ISP Agreement"), Digital solicited and serviced Nextel customers in exchange for payments from Nextel. Nextel was Digital's largest and most important client. In return for securing new Nextel customers, Digital received commissions and the rights to residual payments if the customers remained with Nextel. Although it received payments from Nextel and the other

providers, Digital never earned a net profit.

The Nextel ISP Agreement provided that (1) Nextel controlled the rates Digital charged to subscribers, (2) Nextel determined final acceptance or rejection of potential subscribers, (3) the subscription relationship was between Nextel and the subscribers, (4) all subscriber information and lists belonged to Nextel, and (5) Digital would return all subscriber information and sales materials to Nextel upon termination of the ISP Agreement.

Like Plaintiff Digital, Defendant BearCom is a marketer of cellular telephone products and services. BearCom is also an authorized independent sales representative for Nextel. Dave Wilkins oversaw BearCom's Digital Division, while Craig Wilkins was BearCom's Director of Digital Division, East Coast.

*B. Initial Negotiations And The Assignment Agreement*

BearCom initially approached Popa about coming to work for BearCom. This evolved into negotiations for BearCom's purchase of various Digital assets and liabilities. Plaintiff Popa testified that in September 1999, BearCom's Dave Wilkins asked if Popa "might be considering selling [Digital's] Nextel business." [J.A. 87-88]. Popa testified that he understood BearCom's intention was to purchase all of Digital's assets and assume all of its liabilities. BearCom requested and received information on Digital's assets and liabilities. Digital's primary asset was its right to the residual profit stream from its relationship with Nextel. The revenue stream had a potential value of $250,000 over three years.

On November 1, 1999, Digital and BearCom executed the Assignment, Assumption, and Consent Agreement. Popa and Wisniewski signed the document on Digital's behalf, while John

Watson, BearCom's Vice President, signed for BearCom. The Assignment Agreement identified Digital as "Assignor" and BearCom as "Assignee." Nextel was also a party to the Assignment Agreement. The Assignment Agreement was split into two sections: (1) recitals and (2) specific contract provisions.

As described above, the parties principally disagree regarding whether BearCom agreed to assume certain Digital liabilities. In Recital B, the Assignment Agreement provides: "Assignor has requested Nextel's written consent to assign the ISP Agreement to Assignee . . . . The assignment has been requested *in furtherance of an acquisition of all of Assignor's assets and liabilities* by Assignee." [J.A. 248] (emphasis added). Recital C states: "Assignee desires to take assignment of the ISP Agreement and acquire all the rights and be subject to and responsible for all of the obligations *under the ISP Agreement*." *Id.* (emphasis added).

In Provision 1, "Assignor [Digital] hereby assigns, transfers, sells and conveys to Assignee [BearCom], its successors and assigns, all of Assignor's rights, title and interest in and to *the ISP Agreement*." *Id.* (emphasis added). In Provision 2, "Assignee, for itself and its successors and assigns, hereby assumes and agrees to perform any and all obligations of Assignor *under the ISP Agreement arising from and after this date*." *Id.* (emphasis added). In Provision 4(D), BearCom agreed to pay "all amounts owed to Brightpoint by Assignor, as arranged with Brightpoint, upon execution of this Agreement." [J.A. 249].

Although the Assignment Agreement does not mention the price BearCom paid for Digital's assets, the parties agree that the purchase price was $160,000.

*C. Subsequent Negotiations*

Digital characterizes the Assignment Agreement as only the first part of a two-part transaction. In the first part of the transaction, the Plaintiffs say BearCom agreed to pay $160,000 to purchase the Nextel residual payment stream and the assets and liabilities outlined in the Assignment Agreement. The Plaintiffs say in the second part of the transaction, BearCom agreed to purchase Digital's non-Nextel assets and assume the non-Nextel liabilities. According to Popa, BearCom agreed to provide final approval of the second part after the parties signed the Assignment Agreement on November 1, 1999. Popa says that after November 1, the parties still had to work out the manner in which BearCom would pay Digital's liabilities.

Not surprisingly, Defendant BearCom disagrees with Popa's account. BearCom says there was no larger transaction. Instead, says BearCom, the Assignment Agreement stood alone and the parties continued to negotiate after November 1, 1999, over the purchase of other Digital assets and liabilities, including contracts with other cellular providers, office equipment, furniture, and office leases. BearCom points to Popa's testimony that after November 1, the parties had not yet finalized the terms of BearCom's purchase of the entire Digital enterprise:

> Q: What was the purpose of discussing these issues at these meetings [with Craig and Dave Wilkins]?
>
> A: That they had not finalized, not come into town to see us to finalize these issues and we needed to get them finalized in writing to finalize the Digital 2000 purchase.

[J.A. 93]. Popa also testified that "[t]here was no other finalized agreement," besides the Assignment Agreement. [J.A. 91].

After closing the Assignment Agreement, BearCom submitted two drafts of another purchase

agreement to Digital. Popa testified that the Plaintiffs did not sign BearCom's draft agreements because the terms were not consistent with the purported oral agreement. In particular, BearCom's draft agreements stated that BearCom did not assume Digital's liabilities and included a covenant not to compete.

*D. Asset Transfers And The Payment To Brightpoint*

On November 2, 1999, Popa wrote Dave Wilkins a letter regarding Digital's debt to Brightpoint. Popa wrote: "Per our agreement dated Nov. 1," "Digital 2000 allows Bearcom to deduct from our proceeds the amount of $45,870.17 to send directly to Brightpoint regarding account number 129577." [J.A. 434]. BearCom paid that amount to Brightpoint, deducting it from Digital's $160,000 in proceeds from the Assignment Agreement. BearCom paid the remaining $114,129.83 to Digital.

After November 1, 1999, the Plaintiffs say Digital transferred more assets to BearCom than the Assignment Agreement required. The Plaintiffs point to these transfers as evidence of an overriding oral agreement between the parties. Among the assets transferred were the business name "Digital 2000," Digital's three business phone numbers, and customer lists for subscribers to Nextel and other service providers. Popa testified that Digital also transferred its contractual rights with cellular providers other than Nextel. Digital completed this transfer by sending BearCom its computer files and hard copies of documents. The Plaintiffs say that BearCom did not pay anything for the non-Nextel contract assets. By the end of 1999, Plaintiffs Popa and Wisniewski and five other Digital employees began to work for BearCom. Popa and Wisniewski worked there until mid-2000.

BearCom separately paid approximately $10,000 to Digital for certain office equipment and furniture. BearCom assumed leases for additional office furniture from Digital. BearCom also purchased Digital's inventory of cellular phone equipment in a separate cash transaction for $5,113.60.

The Plaintiffs say that by failing to assume all of Digital's liabilities, BearCom left them with $100,000 in debts to Comerica Bank and Standard Federal Bank. The Plaintiffs also had to pay $11,841.06 to terminate their lease with Digital's landlord when BearCom failed to assume the lease. The Plaintiffs entered into a payment plan with Comerica, and Standard Federal sued the Plaintiffs in state court to collect on Digital's debt.

The Plaintiffs sued BearCom in Michigan state court on November 7, 2002. BearCom removed the case to the district court on December 9, 2002. After discovery, BearCom filed its motion for summary judgment. Judge Victoria Roberts granted BearCom's motion on December 22, 2003.

## II. Legal Standard

This Court reviews a district court's grant of summary judgment *de novo*. *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000). Summary judgment is appropriate when the evidence submitted shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In seeking summary judgment, the moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the nonmoving party's case. *Waters v. City of Morristown*, 242 F.3d 353, 358 (6th Cir. 2001). A fact is material if its resolution will affect the outcome of the lawsuit.

*Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 597 (6th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In deciding whether the moving party has met this burden, a court must view the facts and all inferences drawn from them in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). However, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party satisfies this burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue. *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). It is not sufficient for the nonmoving party merely to show that there is some metaphysical doubt as to the material facts. *See id.*

A factual dispute precludes summary judgment only if it is material, that is, if it relates to a matter essential to adjudication. The dispute must concern facts that, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson*, 477 U.S. at 248. The factual dispute also must be genuine. The facts must be such that if proven at trial a reasonable jury could return a verdict for the nonmoving party. *Id.* at 248. "The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)); *see also Celotex*, 477 U.S. at 322.

## III. Discussion

*A. Breach Of Contract*

In granting summary judgment to Defendant BearCom on the contract claim, the district court found (1) the recitals in the Assignment Agreement were not binding on BearCom, (2) there was insufficient evidence of an oral agreement for BearCom to acquire all of Digital's assets and liabilities, and (3) the Plaintiffs waived their right to enforce the purported oral agreement. The Plaintiffs contend that the district court failed to view the evidence in their favor and applied the incorrect legal standard on the waiver issue. Alternatively, the Plaintiffs argue that even if there were no oral agreement between the parties, BearCom failed to pay the full amount due under the Assignment Agreement.

*1. The Assignment Agreement Recital*s

Recital B to the Assignment Agreement states that Digital requested Nextel's consent to assign the ISP Agreement to BearCom "in furtherance of an acquisition of *all* of [Digital's] assets and liabilities by [BearCom]." [J.A. 248] (emphasis added). Digital views the recital as evidence that BearCom and Digital had an oral agreement for BearCom to purchase all of Digital's assets and assume all of Digital's liabilities. But for Recital B, the Assignment Agreement indicates that BearCom would acquire only Digital's assets and liabilities that arose out of the Nextel ISP Agreement. BearCom argues that the recital does not reflect an express agreement to acquire all of Digital's assets and liabilities.

Under Michigan law, recitals "serve as a preface or preliminary statement introducing the subject in relation to which the parties contract, indicating to a greater or less[er] degree the reasons for and intent of what follows." *Acme Cut Stone Co. v. New Center Dev. Corp.*, 274 N.W. 700, 705

(Mich. 1937) (citation omitted). Recitals may be either general or particular. Particular recitals involve statements of fact and are "treated as conclusive evidence of the facts stated," while "general recitals may not be. " *Id.* (citation omitted). In *Acme*, the Michigan Supreme Court characterized contract recitals such as "it was agreed in said contracts," and "the parties have agreed" as particular recitals. The district court characterized Recital B as a general recital, and thus not conclusive evidence of the facts stated. The Plaintiffs ask that we view Recital B as a particular recital.

We agree with the district court that Recital B is a general recital, and is insufficient evidence of any oral contract. Unlike the particular recital language in *Acme*, Recital B does not say that the parties had reached an agreement for BearCom to acquire all of Digital's assets and liabilities. In the absence of particular language reflecting a completed oral acquisition agreement, Recital B is general.

Even if we characterize Recital B as a particular recital, it does not help the Plaintiffs. Recital B only states that the parties formed the Acquisition Agreement "in furtherance of" BearCom's acquisition of all Digital assets and liabilities. The Oxford English Dictionary defines "furtherance" as "the fact or state of being furthered or helped forward; the action of helping forward; advancement, aid, assistance." The use of the term "in furtherance of" indicates that the parties had not yet finalized an oral acquisition agreement. At most, it suggests the parties were still negotiating. This interpretation is supported by Plaintiff Popa's testimony that certain details of the oral contract remained unresolved after November 1, 1999.

### 2. *Evidence Of An Oral Contract*

The Plaintiffs contend that the district court ignored evidence that raised a question of

material fact as to whether the parties formed an oral acquisition agreement covering all of Digital's assets and liabilities. An enforceable contract is not created unless there is an offer, an acceptance, and a mutual assent on all essential terms. *Eerdmans v. Maki*, 573 N.W.2d 329, 332 (Mich. Ct. App. 1997). "Mere discussions and negotiations cannot be a substitute for the formal requirements of a contract." *Id.*

Contracting parties may enter into an oral contract. In that case, the parties' course of dealing and performance demonstrates the contract's terms. *H.J. Tucker & Assoc. v. Allied Chucker & Eng'g Co.*, 595 N.W.2d 176, 185 (Mich. Ct. App. 1999).

In support of their argument, the Plaintiffs offer five points supporting the existence of an oral contract between BearCom and Digital. None of the proffered evidence shows the existence of any final agreement.

First, Plaintiff Wisniewski testified that Craig Wilkins of BearCom assured Wisniewski that the Assignment Agreement "would address [his] concerns" about the assumption of all of Digital's liabilities. [J.A. 173]. As discussed above, the Assignment Agreement only provided that BearCom would assume the Brightpoint debt. Wisniewski testified that he was not concerned that Digital's other liabilities were not itemized in the Assignment Agreement because of Recital B's language that referred to furthering an acquisition of all of Digital's assets and liabilities. Whether or not Wisniewski reasonably felt assured by the language in Recital B, Craig Wilkins's assurances to him are not evidence of a completed oral contract. Wilkins referred only to the terms of the written Assignment Agreement, and not any oral agreement.

Second, Popa testified that Dave and Craig Wilkins repeatedly promised the Plaintiffs that

BearCom would assume all of Digital's liabilities. Popa said that on two occasions before the parties signed the Assignment Agreement, Dave and Craig Wilkins agreed that BearCom would purchase both the Nextel residual payment stream and "everything else Digital 2000 had." [J.A. 88, 90]. But Popa also testified that details of the larger acquisition by BearCom still remained unresolved after November 1. Wisniewski offered similar testimony:

> Q.  So there were details regarding how this transaction was going to occur --
>
> A.  Yes.
>
> Q.  -- that were not contained in the November 1st Assignment Agreement?
>
> A.  That's correct.
>
> Q.  And these details were going to be worked out after the November 1st Assignment Agreement?
>
> A.  That's right.
>
> Q.  Were those details ever worked out?
>
> A.  No.

[J.A. 180]. Even if BearCom's representatives made a general offer to purchase all of Digital's assets and liabilities before signing the Assignment Agreement, it is clear that the parties never resolved all of the essential details of the larger transaction.

Third, the Plaintiffs say that the only issue remaining between the parties was how the agreement would be implemented, not whether there was an agreement. Wisniewski testified that after November 1, 1999, the parties still needed to resolve the manner in which BearCom would pay

Digital's liabilities. Popa also testified that at the time he signed the Assignment Agreement, he and Wisniewski expected to receive another agreement from BearCom. Taken together, this testimony indicates that essential elements of the agreement to assume Digital's liabilities remained unresolved, thereby precluding the formation of an oral contract.

Fourth, Popa testified that after the parties signed the Assignment Agreement, BearCom prepared two draft acquisition agreements covering the larger acquisition. Popa rejected these documents because they were not consistent with his understanding of the oral agreement. Again, Popa's testimony does not indicate that the parties had reached a definite oral agreement. The more reasonable inference is that BearCom and Digital had conflicting views on the essential terms of any such oral agreement.

Fifth, the Plaintiffs say BearCom never paid for Digital's name, goodwill, business telephone numbers, customer information, and other Digital assets. Under the Assignment Agreement, BearCom purchased all of Digital's rights and obligations under the Nextel ISP Agreement. The Assignment Agreement thus included Digital's Nextel subscriber information and lists. Wisniewski also testified that BearCom paid for all assets it received from Digital:

> Q:    I'm interested in assets sitting here as of today [BearCom] has
>        not paid for they received from Digital 2000.
>
> A:    I think they paid for, you know, those assets.

[J.A. 178].

Digital had contracts with other cellular providers, and Wisniewski testified that negotiations as to whether BearCom would purchase those contracts continued after November 1, 1999. This

suggests that, as of November 1, 1999, there was no overall oral agreement regarding whether BearCom would acquire all of Digital's assets and liabilities. Despite what the recital language may say, Wisniewski recognized that BearCom had not yet committed to buying everything. The Plaintiffs offer no evidence regarding the value of the non-Nextel contracts. Popa testified that Digital received commissions upon signing new cellular customers for Sprint PCS, OMNI Point, and AT&T Wireless, but did not have residual income streams from those providers. Those contracts thus provided no immediate income upon transfer to BearCom. Other than Nextel, Digital received a residual income stream only from LDMI. The LDMI income stream was only $5 per month as of November 1999.

BearCom purchased additional assets from Digital on a piecemeal basis. In November 1999, BearCom paid Popa $3138 for various Digital office equipment. In January 2000, BearCom paid Popa $3240 for other office equipment. In February 2000, BearCom paid $5113.60 for Digital's inventory of cellular phones.

The only remaining assets that Digital transferred to BearCom, supposedly without receiving payment, were Digital's name, goodwill, and business telephone numbers. According to Popa, after closing the Assignment Agreement BearCom began to use the Digital 2000 business name and phone numbers. Digital transferred its office phone numbers to BearCom, and BearCom personnel answered incoming calls by saying "BearCom-Digital 2000." These circumstances might offer some support for Digital's oral contract theory, if not for Popa's and Wisniewski's own testimony. Popa and Wisniewski both make clear that many issues remained unresolved after November 1, 1999, and that the parties never reached a firm oral agreement.

Viewing the facts in the light most favorable to the Plaintiffs, we cannot say that there is evidence that the parties formed a final oral contract for BearCom's purchase of all of Digital's assets and liabilities. For this reason, we affirm the judgment of the district court.

*3. Waiver*

The district court found that the Plaintiffs' piecemeal negotiations and transactions after the Assignment Agreement constituted a waiver of any oral acquisition agreement. Under Michigan law, "[a] waiver occurs when a party 'with full knowledge of material facts, does or forbears to do something inconsistent with the existence of the right in question or his intention to rely on that right.'" *Kvaerner U.S., Inc. v. Hakim Plastic Co.*, 74 F. Supp. 2d 709, 718 (E.D. Mich. 1999) (quoting *Fitzgerald v. Hubert Herman, Inc.*, 179 N.W.2d 252, 253 (Mich. Ct. App. 1977)). A party can establish a waiver "through clear and convincing evidence of a written agreement, oral agreement, or affirmative conduct establishing mutual agreement to waive the terms of the original contract." *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 258 (Mich. 2003).

The Plaintiffs argue that the few "nickel and dime" transactions after November 1, 1999 are not clear and convincing evidence that Digital waived BearCom's obligation to acquire all of Digital's assets and liabilities under the supposed oral contract. We disagree. Assuming that Digital and BearCom formed an oral contract obligating BearCom to acquire all of Digital's assets and liabilities, there was no need for Digital to negotiate further with BearCom. Despite BearCom's alleged obligations, Digital continued to negotiate the sale of specific assets to BearCom. This constituted affirmative conduct that waived the terms of the oral acquisition agreement.

*4. Breached Obligations Under The Assignment Agreement*

The Plaintiffs contend that the Defendant breached its obligations under the Assignment Agreement with respect to Digital's Brightpoint debt. They say that BearCom violated the Assignment Agreement by deducting the amount of the Brightpoint debt from the amount it paid Digital, and then failing to repay Digital for that amount. The district court found that BearCom had no obligation to reimburse Digital for money paid to Brightpoint out of Digital's proceeds.

In paragraph 4D of the Assignment Agreement, BearCom agreed to pay all amounts that Digital owed to Brightpoint. On November 2, Popa wrote Dave Wilkins a letter that provided:

> Per our agreement dated Nov. 1 between Digital 2000, Nextel and Bearcom regarding our balance with Brightpoint. Digital 2000 allows Bearcom to deduct from our proceeds the amount of $45,870.17 to send directly to Brightpoint regarding account number 129577.

[J.A. 434]. The Plaintiffs also point to Wisniewski's testimony that he understood BearCom would pay off Digital's debt. But most convincing, in Provision 4(D) of the Assignment Agreement, BearCom agreed to pay "all amounts owed to Brightpoint by Assignor, as arranged with Brightpoint, upon execution of this Agreement." [J.A. 249]. We find this sufficient to raise a material issue as to whether BearCom wrongly deducted the $45,870.17 it sent to Brightpoint from the $160,000 it was obligated to pay.

For this reason, we reverse the district court's grant of summary judgment to the Defendant regarding the Brightpoint debt.

*5. Third Party Beneficiaries*

The district court granted summary judgment to BearCom on the claims of Plaintiffs Popa

and Wisniewski, finding that they were not third party beneficiaries of the Assignment Agreement. The Plaintiffs argue that Popa and Wisniewski were third party beneficiaries because they personally guaranteed Digital's debt to Comerica and Standard Federal. The Defendant responds that the Assignment Agreement did not identify Popa and Wisniewski as third party beneficiaries. We affirm the district court's ruling.

Under Michigan law, one who is not a party to a contract generally lacks standing to sue for breach of that contract. *Gianotta v. Holderid*, 372 N.W.2d 326, 327 (Mich. Ct. App. 1985). An exception applies to contract beneficiaries. Under the Michigan Compiled Laws, a person "for whose benefit a promise is made by way of a contract . . . has the same right to enforce said promise that he would have had if said promise had been made directly to him as the promisee." M.C.L.A. §600.1405. Further, a person shall be considered a contract beneficiary "whenever the promisor of said promise had undertaken to give or to do or refrain from doing something directly to or for said person." *Id.* The test for whether someone is a beneficiary is "an objective one, determined from the form and meaning of the contract." *Guardian Depositors Corp. v. Brown*, 287 N.W. 798, 800 (Mich. 1939).

The Assignment Agreement does not mention Popa or Wisniewski as intended beneficiaries. Neither Digital nor BearCom specifically agreed to any obligation directly for the benefit of Popa or Wisniewski. Although both men signed the Assignment Agreement, they did so on Digital's behalf, and not as parties to the contract or beneficiaries.

The Plaintiffs argue that Popa and Wisniewski are third party beneficiaries because they personally guaranteed Digital's debt to Comerica and Standard Federal. The Plaintiffs cite *Aiton*

*v. Slater*, 299 N.W. 149, 154 (Mich. 1941), for the proposition that a guaranty agreement may provide standing for a third party. We disagree with the Plaintiffs' analysis. In *Aiton*, the Michigan Supreme Court held that the defendant's guaranty of a bond was enforceable even after the bond was assigned to a new owner. The plaintiff was not a guarantor, but instead sought to recover from the guarantor. If anything, *Aiton* implies that Popa and Wisniewski's guarantees would survive assignment of Digital's liabilities to BearCom.

The Plaintiffs' argument fails for an additional reason. As discussed above, the Assignment Agreement did not cover Digital's debts with Comerica and Standard Federal. To the extent Popa and Wisniewski were guarantors of those debts, the Assignment Agreement did not benefit them. We affirm the judgment of the district court.

## B. Unjust Enrichment

As an alternative to their contract claim, the Plaintiffs asserted an unjust enrichment claim against the Defendant. The district court granted summary judgment to the Defendant on the unjust enrichment claim, finding no issue of material fact that the Plaintiffs suffered an inequity from BearCom's conduct.

Unjust enrichment requires a showing of the following: "(1) receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant." *Barber v. SMH (US), Inc.*, 509 N.W.2d 791, 796 (Mich. Ct. App. 1993).

BearCom's CEO Jerry Denham admitted that BearCom used the Digital trade name and business phone numbers without paying for them separately. Denham testified that the $160,000

paid under the Assignment Agreement included the payment for the trade name and the phone numbers. As we have already discussed, and as the Defendant argues, the Assignment Agreement only covered assets arising under the Nextel ISP Agreement. The Defendant suggests that its use of the phone numbers and trade name "were obvious and necessary courtesies pursuant to BearCom's obligation under the ISP Agreement to continue to service Nextel customers who signed up through Digital." [Def. Br. at 39 n.22]. We disagree.

The Assignment Agreement did not mention the trade name or phone numbers, but BearCom used them anyway. The Defendant cannot now argue that the Assignment Agreement included the payment for these separate assets.

Because BearCom received and used assets from Digital, but failed to pay for them, we reverse the district court's judgment on the unjust enrichment claim regarding BearCom's use of Digital's name and phone numbers.

*C. Equitable Accounting*

The Plaintiffs include a claim for an equitable accounting of BearCom's income from the accounts Digital transferred. The district court granted summary judgment to BearCom. The Plaintiffs argue that they must resort to the equitable accounting remedy because the Plaintiffs have not cooperated in discovery. We affirm the judgment of the district court.

Michigan's courts traditionally allowed a party to pursue an equitable accounting action where he was unsure of the amounts at stake and where the accounts at issue were "greatly complicated." *Basinger v. Provident Life & Accident Ins. Co.*, 239 N.W.2d 735, 738 (Mich. Ct. App. 1976). In light of the broad discovery available to litigants, accounting actions are of dubious

utility. *Id.* at 738 n.15. *See also Cyril J. Burke, Inc. v. Eddy & Co.*, 51 N.W.2d 238, 239 (Mich. 1952) ("The suit is to recover a claimed debt arising out of a contract. If Plaintiffs needed any discovery of the amount of profits received by defendant, they could have subpoenaed witnesses or availed themselves of the discovery rule.").

The Plaintiffs say that the Defendant failed to respond to discovery requests regarding the value of the former Digital accounts. If the Plaintiffs felt dissatisfied with the Defendant's discovery responses, they should have filed a motion to compel in the district court. The Plaintiffs failed to do so. We will not consider arguments not raised below. *St. Marys Foundry, Inc. v. Employers Ins. of Wausau*, 332 F.3d 989, 995-96 (6th Cir. 2003).

Additionally, the accounts at issue are not "greatly complicated." *Basinger*, 239 N.W.2d at 738. The Plaintiffs essentially seek payment for all of the assets they transferred to BearCom. The Plaintiffs are in as good a position as the Defendant to determine the value of those assets. An equitable accounting action is not the proper mechanism to recover the money that BearCom allegedly owes.

## IV. Conclusion

For the foregoing reasons, this Court **AFFIRMS** the decision of the district court granting the Defendant's motion for summary judgment on the breach of contract and equitable accounting claims, except as regards the obligation to pay the Brightpoint debt and **REVERSES** the grant of summary judgment on the unjust enrichment claim and the contract claim involving the payment of the Brightpoint obligation.