150 F.3d 594
 Robert O. DAUGHENBAUGH, Plaintiff-Appellant,
v.
CITY OF TIFFIN; Michelle Craig, Charles W. Boyer,
individually and as detective police officers for the City
of Tiffin; and James Jarrett, also known as Jim Jarret,
individually and as probation officer for the Seneca County
Juvenile Court, Defendants-Appellees.
 No. 97-3200.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 13, 1998.
Decided July 31, 1998.
 
 Zach Zunshine (argued and briefed), Columbus, Ohio, for Daughenbaugh.
 Teresa L. Grigsby (briefed), Spengler Nathanson, Toledo, Ohio, James P. Silk, Jr. (argued), Spegler Nathanson, Toledo, Ohio, for City of Tiffin, Craig and Boyer.
 Timothy S. Rankin (argued and briefed), Isaac, Brant, Ledman & Teetor, Columbus, Ohio, for Jarrett.
 Before: RYAN, COLE, and GILMAN, Circuit Judges.
 OPINION
 GILMAN, Circuit Judge.
 
 
 1
 This is a civil action brought under 42 U.S.C. § 1983 by a homeowner against his municipality and three of its law enforcement officers. The homeowner seeks damages resulting from the warrantless search of his unattached and remote garage in pursuit of stolen goods placed there by a thief without the homeowner's knowledge. The district court granted summary judgment in favor of all the defendants, holding that the garage was not part of the home's "curtilage," and that the officers were entitled to qualified immunity.
 
 
 2
 For the reasons set forth below, we find that the garage was a part of the home's curtilage. Accordingly, the officers' warrantless search of the garage violated the Fourth Amendment's prohibition against unreasonable searches and seizures. The officers' entrance into the homeowner's backyard also constituted a search in violation of the Fourth Amendment. Because we conclude that the contours of curtilage were not sufficiently clear at the time of the search, however, we AFFIRM the district court's grant of qualified immunity to the officers involved.
 
 I. BACKGROUND
 
 3
 On May 24, 1994, the police arrested a local resident named Mike Hall in connection with a series of burglaries from garages in the city of Tiffin, Ohio. After being interrogated by officers Michelle Craig and Charles Boyer, Hall confessed to the burglaries. James Jarrett, a juvenile probation officer, witnessed the interrogation. Hall informed the police that he had secreted the stolen goods in a garage located behind plaintiff Robert Daughenbaugh's house. Hall also told the police that Daughenbaugh was unaware that the stolen goods were in the garage. The three officers then took Hall to Daughenbaugh's house, where they intended to check out Hall's assertion.
 
 
 4
 One of the officers apparently had met Daughenbaugh on a previous occasion and believed that he would consent to a search of his garage. After arriving at the house, officers Craig and Jarrett went to the front door. They neither saw Daughenbaugh's car nor heard any noise emanating from the house. There was thus no indication that Daughenbaugh was at home. Notwithstanding this fact, the officers proceeded to the back door because they believed that the common sitting area was located at the rear of the house. Once again there was no answer.
 
 
 5
 Unable to locate Daughenbaugh, officers Craig and Jarrett met officer Boyer and Hall in the backyard. From that vantage point, they were able to see what appeared to be the stolen goods strewn across the floor of the open garage. They then proceeded to the unattached garage and confiscated the stolen goods. The officers did not obtain a warrant prior to searching the property and seizing the items from the garage.
 
 
 6
 Daughenbaugh's house is located at the end of his street and is blocked on the left side by a river. The river curves to form an additional barrier behind the house. The side along the river is lined with tall trees and shrubbery, obscuring a view of the house on the left and back sides. On the right side of the house, trees block the neighbors from looking directly into the garage. The extent of the tree coverage on the right side of the house, however, is unclear from the pictures that are part of the record. The pictures clearly show that a large tree stands in the middle of the backyard. This tree as well as the house obstruct the view from the street into the backyard and the garage. In addition, there is no sidewalk in front of Daughenbaugh's property.
 
 
 7
 The garage is about fifty to sixty yards behind the house, and eighty to ninety yards from the street. A driveway leads from the street to an attached carport, and then continues straight back toward the unattached garage. At the time of the search, the spring on the garage door was broken, and the door was open. Moreover, the roof and the walls of the garage were in serious disrepair. Daughenbaugh stored various tools, extension cords, and a lawn mower in the garage. He did not use the garage to park his car.
 
 
 8
 The police claim that after parking their car in the attached carport, they could see the stolen goods in the garage. Daughenbaugh, on the other hand, claims that the police could not see inside the garage until they actually reached it. The district court, viewing the facts in a light most favorable to Daughenbaugh, found that the police "had to walk to the rear of the property in the direction of the garage" in order to see the stolen items. Daughenbaugh v. City of Tiffin, 949 F.Supp. 1315, 1318 (N.D.Ohio 1996).
 
 
 9
 The district court held that the unattached garage was not a part of the house's curtilage and thus "the Fourth Amendment does not apply to the actions of the officers in this case." Id. 949 F.Supp. at 1319. Instead, the court concluded that "the 'search' of the garage was an 'open field' search, as to which the Fourth Amendment provides no protection." Id. The district court then determined that the officers lawfully proceeded to Daughenbaugh's house after receiving the tip, and that they lawfully approached the garage because it was not part of the curtilage. In making its determination that the garage was not a part of the curtilage, the district court considered the multifactor test outlined by the Supreme Court in United States v. Dunn, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987).
 
 
 10
 In addition, the district court held that even if the officers violated Daughenbaugh's Fourth Amendment right against unreasonable searches, they were entitled to qualified immunity. The court determined that the officers' actions could not be considered "objectively unreasonable" because "[a]t most, the curtilage question is one about which reasonable officers--and judges--could disagree." Daughenbaugh, 949 F.Supp. at 1322.
 
 
 11
 In this appeal, Daughenbaugh challenges the district court's decision granting summary judgment to officers Craig, Boyer, and Jarrett and denying his motion for summary judgment against officers Craig and Boyer. Daughenbaugh does not appeal the district court's order granting summary judgment in favor of the city of Tiffin.
 
 II. STANDARD OF REVIEW
 
 12
 This court reviews a district court's order granting summary judgment de novo. Brooks v. American Broad. Cos., 932 F.2d 495, 500 (6th Cir.1991). All factual inferences "must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment is only appropriate if no genuine issue of material fact is in dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if its resolution will affect the outcome of the lawsuit. Id. at 248, 106 S.Ct. 2505. All factual inferences alleged by the nonmoving party must be taken as true for the purposes of a summary judgment motion. Matsushita, 475 U.S. at 587, 106 S.Ct. 1348 (citations omitted).
 
 
 13
 Both parties, on the other hand, contend that this court must adopt all of the district court's factual findings unless they are clearly erroneous. They support this contention by citing numerous criminal law cases that conclude that curtilage questions are factual determinations. See United States v. Reilly, 76 F.3d 1271, 1275 (2d Cir.1996) (joining the Third, Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits in concluding that curtilage is essentially a factual question); United States v. Traynor, 990 F.2d 1153, 1156 (9th Cir.1993) (noting that the Third, Fifth, and Eleventh Circuits have found curtilage to be a factual question). None of the cases cited by the parties, however, address the standard of review in the context of a civil action brought pursuant to 42 U.S.C. § 1983 and, in particular, the standard for reviewing a grant of summary judgment. Because this is an appeal of a civil case dismissed on summary judgment, our review of the district court's decision de novo is clearly the appropriate standard.
 
 III. ANALYSIS
 A. The Garage as Curtilage
 
 14
 To successfully establish a prima facie case under 42 U.S.C. § 1983, a plaintiff must prove the following two elements: (1) the defendant was acting under the color of state law, and (2) the offending conduct deprived the plaintiff of rights secured by federal law. Parratt v. Taylor, 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Because the defendants acted in their official capacity as law enforcement officers on the day in question, they do not dispute that they were acting under the color of state law. As for the second element, Daughenbaugh alleges that his constitutional rights were violated when officers Craig, Boyer, and Jarrett searched his backyard, and when officers Craig and Boyer entered his garage and seized the stolen items without a warrant.
 
 
 15
 The Fourth Amendment protects individuals from unreasonable searches and seizures. It provides that:
 
 
 16
 The right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
 
 
 17
 U.S. CONST. amend. IV. The Fourth Amendment's protections apply with equal force in civil cases as they do in criminal ones. See Soldal v. Cook County, 506 U.S. 56, 67 & n. 11, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992). Courts have interpreted this right as extending to the curtilage of the home because individuals possess a "reasonable expectation of privacy" in the area surrounding and appurtenant to the home. United States v. Reilly, 76 F.3d 1271, 1275 (2d Cir.1996). In expanding upon the general principles governing Fourth Amendment jurisprudence, the Supreme Court has observed that "the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." United States v. Dunn, 480 U.S. 294, 300, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987).
 
 
 18
 The Supreme Court has noted that, "for most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage--as the area around the home to which the activity of home life extends--is a familiar one easily understood from our daily experience." Oliver v. United States, 466 U.S. 170, 182 n. 12, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). Unfortunately this test endorses a "we know it when we see it" approach that provides little guidance to courts attempting to determine whether a particular area falls within a home's curtilage. See United States v. Jenkins, 124 F.3d 768, 772 (6th Cir.1997) (observing that "[t]he concept of curtilage, unfortunately, evades precise definition"); Reilly, 76 F.3d at 1273 (commenting that curtilage is "an area where the contours of search-and-seizure law are anything but clear").
 
 
 19
 In an effort to clarify the law in this area, the Supreme Court in United States v. Dunn, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), outlined four factors to employ as "analytic tools" in determining whether a particular area constitutes curtilage. Id. at 301, 107 S.Ct. 1134. These factors are as follows: " the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing." Id. Ultimately, these tools should serve to assist a court in resolving the central inquiry of the curtilage analysis--whether the area harbors the "intimate activity associated with the sanctity of a man's home and the privacies of life." Id. at 300, 107 S.Ct. 1134 (internal quotation marks and citations omitted).
 
 
 20
 As the Second Circuit recently observed, "[e]very curtilage determination is distinctive and stands or falls on its own unique set of facts." Reilly, 76 F.3d at 1276 (quoting United States v. Depew, 8 F.3d 1424, 1426 (9th Cir.1993)). We thus must apply the four factors outlined in Dunn to the facts of the instant case. First, we consider the proximity of the garage to Daughenbaugh's house. The record indicates that the garage was between fifty and sixty yards away. Considered alone, this fact is inconclusive. The barn in Dunn was also fifty yards from the home, and it was found to be outside the curtilage. Structures located at a greater distance from the home, however, have been determined to fall within the curtilage. For example, in United States v. Reilly, the cottage in question was located 375 feet from the main residence. Yet the Second Circuit concluded that, under the circumstances, the cottage was within the curtilage. Reilly, 76 F.3d at 1279. In United States v. Depew, 8 F.3d 1424 (9th Cir.1993), the Ninth Circuit noted that "[t]here is not ... any fixed distance at which curtilage ends." Id. 8 F.3d at 1427. Without reference to the additional Dunn factors, the distance of the garage from Daughenbaugh's house is not determinative.
 
 
 21
 We must next consider whether the garage was within an enclosure surrounding the house. The district court noted that the house and garage were not surrounded by an artificial enclosure, such as a fence. It was not persuaded by Daughenbaugh's claim that the garage and house were enclosed by natural boundaries. Hence, the court concluded that Daughenbaugh had not demonstrated that the garage was "part and parcel of the house." Daughenbaugh v. City of Tiffin, 949 F.Supp. 1315, 1320 (N.D.Ohio 1996) (quoting Dunn, 480 U.S. at 302, 107 S.Ct. 1134). Several other courts, however, have considered natural enclosures to be compelling evidence. In Williams v. Garrett, 722 F.Supp. 254 (W.D.Va.1989), for example, the district court held that "reading the word 'enclosure' in Dunn to require an artificial barrier seems unduly narrow." Id. 722 F.Supp. at 260. The plaintiff's property in Williams was enclosed by woods and hedges. Id. 722 F.Supp. at 261. The court correctly observed that "requiring a person to expend resources and sacrifice aesthetics by building a fence in order to obtain protection from unreasonable searches is not required by the constitution." Id.
 
 
 22
 In the instant case, the pictures provided by the officers indicate that the garage is within natural boundaries demarcated by the river and the heavy tree coverage. It also appears that the backyard and garage are not readily visible from the street. Whether trees obstruct the view from the right side of the house, however, is unclear. While Daughenbaugh's neighbor on that side of the house could not see inside of the garage because of a large tree blocking the view, it is uncertain whether the entire backyard is blocked. Viewing the facts most favorably to the nonmoving party, we conclude that the garage and backyard are sufficiently blocked from public view by natural barriers to establish that the second Dunn factor weighs in favor of finding that Daughenbaugh possessed a reasonable expectation of privacy in those areas.
 
 
 23
 The third Dunn factor requires us to consider Daughenbaugh's use of the garage. The district court found that the garage was not "associated with the activities and privacies of domestic life." Daughenbaugh, 949 F.Supp. at 1320 (quoting Dunn, 480 U.S. at 302, 107 S.Ct. 1134). It relied on the fact that Daughenbaugh neither parked his car nor engaged in many activities within the garage. The district court also was influenced by the fact that the garage was in serious disrepair.
 
 
 24
 The Supreme Court in Dunn placed significant weight on the officer's possession of "objective data" that the barn in question was used to manufacture drugs. Dunn, 480 U.S. at 302-03, 107 S.Ct. 1134. Such data was obtained by taking aerial photographs of the barn prior to entering the defendant's property. Id. at 302, 107 S.Ct. 1134. The Dunn Court also considered the information learned by the officers after they entered the property, but while still standing outside the curtilage demarcated by the fence surrounding the home. Id. at 302-03, 107 S.Ct. 1134. Moreover, they obtained a warrant prior to entering the barn. Id. at 298, 107 S.Ct. 1134.
 
 
 25
 In the instant case, the only objective information known by the officers was Hall's statement that he had hidden the stolen goods in Daughenbaugh's garage. Prior to entering Daughenbaugh's backyard, the officers had no information concerning Daughenbaugh's use of the garage. In Reilly, the Second Circuit rejected the government's argument that " 'objective data' existed because the officers had smelled a marijuana odor from the air conditioner at the side of the cottage." United States v. Reilly, 76 F.3d 1271, 1279 (1996). Instead, the court observed that "[t]his so-called 'objective data' was found only after the officers invaded the area--the edge of the cottage. As such it cannot constitute the kind of objective data about use that would lead reasonable officers to believe, when they went there, that the area was not used for private purposes." Id.
 
 
 26
 Considering similar factors, the Tenth Circuit in United States v. Swepston, 987 F.2d 1510 (10th Cir.1993), found that the district court's determination that a chicken shed fell within the curtilage was not clearly erroneous. Id. 987 F.2d at 1514. The Swepston court observed that the officers possessed no objective data that the shed was being used for purposes other than domestic use. Id. 987 F.2d at 1515. Instead, the court observed that "all the ... officers knew before they spotted the marijuana was that the barn was partially roofed, old, and dilapidated." Id. Even the fact that the contents of the shed could have been seen through aerial surveillance did not convince the court that the shed fell outside the curtilage. Id. Nor was the court persuaded that the shed fell outside the curtilage because it was in a "dilapidated" condition. Id.
 
 
 27
 With regard to the amount of objective data required, the Ninth Circuit, in United States v. Depew, 8 F.3d 1424 (9th Cir.1993), determined that information provided by an informant's tip, standing alone, was insufficient. The court held that the tip did not constitute the necessary "objective data" to suggest that the defendant used the garage "for illegal activity rather than for those activities associated with the privacies of domestic life." Id. 8 F.3d at 1427.
 
 
 28
 In the case at bar, the officers had no objective data concerning the use or condition of Daughenbaugh's garage until after they entered his backyard. From that vantage point, they were able to see the contents of the garage. Thus any reliance placed either on observations made after the officers entered the backyard or on Daughenbaugh's statements after the commencement of this lawsuit cannot be considered as a part of the officers' "objective knowledge." See infra Part III. B. (discussing the backyard as curtilage). If we ignore all of the prohibited information, then only Hall's statement that he placed the stolen goods in Daughenbaugh's garage remains. According to the record, Hall never indicated how Daughenbaugh used the garage. Hall's statement alone does not create the inference that Daughenbaugh used the garage located on his property for anything other than domestic activities.
 
 
 29
 Even if we were to accept that the officers learned of the dilapidated condition of the garage before they entered the protected area, this information alone does not warrant a finding that the garage falls outside the curtilage. Perhaps Sir Edward Coke best articulated the manner in which courts should consider this type of evidence when he said:
 
 
 30
 The poorest man may in his cottage bid defiance to all the forces of the crown; it may be frail, its roof may shake, the wind may blow through it; the storm may enter, the rain may enter; but the king of England cannot enter; all his forces dare not cross the threshold of the ruined tenement.
 
 
 31
 Flagg v. United States, 233 F. 481, 482 (2d Cir.1916) (quoting Chatham's recitation of Sir Edward Coke's comment, delivered during Chatham's address on the Excise Bill). If the king of England is forbidden from entering the most humble of homes without a warrant, then surely the Tiffin police department should equally pause before crossing the threshold of Daughenbaugh's dilapidated garage.
 
 
 32
 The last of the Dunn factors requires us to consider the steps taken by Daughenbaugh to protect the garage from observation by others. The district court found that Daughenbaugh took no steps to prevent casual onlookers from viewing the garage. This conclusion goes too far. The garage was set far back from the road and located behind the house, so that members of the public walking down the street could not see it. A large tree in the backyard prevented neighbors and those parked in the driveway from seeing inside the garage. Nor was the inside of the garage visible from any open fields that may have surrounded the property. In addition, the contents of the garage would not have been visible from aerial surveillance. Instead, the contents were only visible after a person entered the backyard and approached the garage. Unlike the district court, we therefore believe that the fourth Dunn factor weighs in favor of finding that the unattached garage was a part of the curtilage.
 
 
 33
 We also find that no exigent circumstances existed that required the officers to immediately seize the stolen goods. Hall had previously told the officers that Daughenbaugh was totally unaware that the goods were in his garage. Presumably the only person who had an incentive to dispose of the evidence was Hall, and he was in custody. Consequently, very little risk existed that the evidence would disappear.
 
 
 34
 Based on the foregoing analysis and considering the facts in a light most favorable to Daughenbaugh, we conclude that the garage was located within the curtilage of his house. The officers consequently violated Daughenbaugh's constitutional rights by conducting a warrantless search of the garage.
 
 B. The Backyard as Curtilage
 
 35
 Daughenbaugh also argues that officers Craig, Boyer, and Jarrett violated his constitutional rights by entering and searching his backyard. This argument finds support in the case of Dow Chemical Co. v. United States, 749 F.2d 307 (6th Cir.1984), aff'd, 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986), where this court in dicta made the following statement:
 
 
 36
 The backyard and area immediately surrounding the home are really extensions of the dwelling itself. This is not true simply in a mechanical sense because the areas are geographically proximate. It is true because people have both actual and reasonable expectations that many of the private experiences of home life often occur outside the house.
 
 
 37
 Id. 749 F.2d at 314; see also United States v. Jenkins, 124 F.3d 768, 773 (6th Cir.1997) (holding that the backyard was a part of the curtilage of the house).
 
 
 38
 The district court did not consider the propriety of the officers' actions when they entered Daughenbaugh's backyard. Instead, the district court relied on a Ninth Circuit case which held that "it does not matter that officers first trespass upon property that is obviously curtilage ... while investigating a tip, as long as the incriminating observations themselves take place outside the protected curtilage." United States v. Traynor, 990 F.2d 1153, 1157 (9th Cir.1993). In formulating this opinion, the Ninth Circuit expanded on the principle set forth in Dunn by stating that the "obvious implication of Dunn is that observations made by officers while they are not within the curtilage of a house do not constitute a search under the Fourth Amendment." Id. The broader principle formulated by the Ninth Circuit, however, is not supported by the holding in Dunn. In fact, the Dunn Court simply held that officers could observe either open fields or curtilage as long as the vantage point of the observation was outside the curtilage. Dunn, 480 U.S. at 304, 107 S.Ct. 1134. Because it is unclear from the Supreme Court's opinion in Dunn whether the officers actually crossed through the curtilage of the home (being the area inside the fence surrounding the residence) when they approached the barn in question, the Traynor Court appears to have deduced too much from the opinion. The broadest principle that may be inferred from the Dunn opinion is that officers may constitutionally view a protected area as long as they make their observations from a lawful vantage point--i.e., a place located outside of the curtilage. Id. (holding that as long as officers were "standing ... in the open fields, the Constitution did not forbid [the officers] to observe" the area assumed to be curtilage).
 
 
 39
 None of the cases, however, permit officers to begin a warrantless search while standing in a constitutionally protected area. In the instant case, the district court found that the officers first spotted the stolen items when they stood in the backyard. While the Supreme Court has never required that "law enforcement officers ... shield their eyes when passing by a home on public thoroughfares," California v. Ciraolo, 476 U.S. 207, 213, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), the officers still must observe the area being searched from a lawful vantage point. See Dunn, 480 U.S. at 304, 107 S.Ct. 1134. Supporting that principle, the Traynor court itself noted that the "incriminating observations" had to take place outside the protected area. 990 F.2d at 1157. The officers in the case at bar made the incriminating observations of the unattached garage while standing in a constitutionally protected area--the backyard. Thus the holding in Traynor is inapplicable to the facts of the instant case even if the Ninth Circuit decision correctly interpreted Dunn.
 
 
 40
 In United States v. Jenkins, 124 F.3d 768 (6th Cir.1997), a case decided after the search of Daughenbaugh's garage, this court held that the police officers had violated the defendants' Fourth Amendment rights when they conducted a warrantless search of the defendants' backyard. In Jenkins, the police conducted an aerial inspection of wooded fields that abutted the defendants' property. They concluded that the woods contained large amounts of marijuana. The defendants lived on a large farm that was divided by a public road. Their home was set back from the road, and most of the view of the backyard from the road was obstructed by the home.
 
 
 41
 After considering the evidence provided by aerial surveillance of the wooded area, the police in Jenkins decided to conduct a search of the woods. Instead of entering the woods through a gate located down the road from the home, the police decided to enter the woods through the defendants' backyard. While passing through the backyard, the police spotted and seized several items that linked the defendants to the marijuana located in the woods. After a careful consideration of the Dunn factors, this court in Jenkins concluded that the backyard fell within the curtilage of the home. Id. 124 F.3d at 773. Accordingly, the officers were held to have violated the defendants' Fourth Amendment rights by not obtaining a warrant prior to entering the backyard. The court was careful to note that "[v]isual inspection from a lawful vantage point, however, is quite different from the physical assault on defendants' backyard that occurred in this case." Id. 124 F.3d at 774. In rejecting the argument that the items were in plain view, the court observed that the particular police officer who began searching the backyard only noticed the incriminating objects after he had entered the yard. The court added that the officer "first searched the backyard before he ever entered the open fields to perform the lawful search of that area. Therefore, [the officer] did not observe these items from an area where he was lawfully entitled to be." Id.
 
 
 42
 Prior to the officers' entrance onto Daughenbaugh's property in the instant case, the only evidence indicating that the garage housed the stolen goods was Hall's confession. While this may have been enough to justify either a trip to Daughenbaugh's house to seek his consent or applying for a search warrant, it did not provide a basis for the officers to invade the backyard and begin searching for the stolen goods without a warrant. See United States v. Whaley, 781 F.2d 417 (5th Cir.1986) (holding that officers should have obtained a warrant when they spotted plants that looked like marijuana rather than invading the curtilage of the defendant's home in order to positively identify the plants as marijuana).
 
 
 43
 As a separate point, officer Jarrett argues that he is not liable because he never actually entered the garage. The record indicates, however, that he was intensely involved in the search and the seizure of the stolen goods. He attempted to secure Daughenbaugh's consent, he entered the backyard, he spotted the goods, and he helped the other officers carry the stolen goods to the police cars. Because Jarrett worked in such close concert with the other officers, he is not entitled to any special immunity simply because he did not actually step inside the garage.
 
 
 44
 Accordingly, we find that officers Craig, Boyer, and Jarrett conducted an unconstitutional search of Daughenbaugh's backyard and garage.
 
 C. Qualified Immunity
 
 45
 The Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Thus, the first step in any qualified immunity analysis is to determine whether a clearly established statutory or constitutional right has been violated. In other words, "for a plaintiff to make a successful § 1983 claim, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " Dickerson v. McClellan, 101 F.3d 1151, 1158 (6th Cir.1996) (quoting Russo v. City of Cincinnati, 953 F.2d 1036, 1042 (6th Cir.1992)). If a constitutional violation has occurred, then the plaintiff must assert "sufficient facts supported by sufficient evidence to indicate what [the officer] allegedly did was objectively unreasonable in light of [the] clearly established constitutional rights." Adams v. Metiva, 31 F.3d 375, 387 (6th Cir.1994).
 
 
 46
 The right of individuals to be free from unreasonable and warrantless searches is a clearly established constitutional right. Courts have accepted the general principle that, absent special circumstances, "warrantless searches are presumptively unreasonable." Horton v. California, 496 U.S. 128, 133, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). The officers' search of Daughenbaugh's garage and backyard violated this general principle. Daughenbaugh has thus discharged his burden under the first prong of the qualified immunity analysis.
 
 
 47
 The second prong, however, poses considerable more difficulty for Daughenbaugh. As previously discussed, the law defining curtilage remains unclear. In addition, the Jenkins case from this court had not been decided at the time of the search. While certainly not conclusive, the divergent conclusions reached by the district court and this court concerning the status of Daughenbaugh's garage is further indication that reasonable minds can differ on whether it should be considered as part of the curtilage. Accordingly, one cannot say that the officers acted in an objectively unreasonable manner when they searched the garage.
 
 
 48
 The search of the backyard presents a closer question. Considering the general complexity of curtilage questions, the law seems relatively unambiguous that a backyard abutting the home constitutes curtilage and receives constitutional protection. The law becomes less clear, however, when it describes the areas that officers are legally entitled to search while attempting to locate a witness or stolen goods. Accordingly, Daughenbaugh must prove that no reasonable officers could have concluded that they were permitted to enter the backyard to begin searching after it was clear that the homeowner was away from the home.
 
 
 49
 We believe that reasonable officers could have concluded that Daughenbaugh's garage was not part of the curtilage, and that they had the right to go through his backyard to get to the garage pursuant to the reasoning in Traynor, 990 F.2d 1153 (9th Cir.1993); see also United States v. Anderson, 552 F.2d 1296, 1300 (8th Cir.1977) (holding that after hearing a dog bark, the agents' action in entering the backyard in an attempt to locate a suspect for questioning was not "so incompatible with the scope of their original purpose that any evidence inadvertently seen by them must be excluded"). Once in the backyard, the officers in the instant case were able to see the stolen goods in plain view from what they thought was a lawful vantage point. Considering Hall's information, along with their apparent belief that a search of the garage was permissible under the circumstances, reasonable officers could have determined that they were permitted to enter the backyard, spot the stolen items, and confiscate the goods.
 
 
 50
 While we now conclude that this determination was inconsistent with the requirements of the Fourth Amendment, it was not an unreasonable conclusion under the circumstances of this case. This is especially so because the illegal search occurred before this court's decision in United States v. Jenkins, 124 F.3d 768 (6th Cir.1997) (holding that one's backyard is definitely part of the curtilage). In light of Jenkins and the instant case, however, the police will be precluded in the future from relying on qualified immunity as a defense to warrantless searches of garages and backyards in situations similar to those herein.
 
 IV. CONCLUSION
 
 51
 For the foregoing reasons, we conclude that Daughenbaugh's garage and backyard fell within the curtilage of his house. Because of the uncertainties regarding the contours of curtilage at the time of the officers' search, however, we AFFIRM the district court's ruling in favor of the officers on the basis of qualified immunity.