**John COFFIN, Cynthia Coffin, Plaintiffs–Appellants,**

**v.**

**Stacy BRANDAU, individually, f.k.a. Stacy Ferris, James Lutz, individually, Defendants–Appellees.**

**No. 08–14538.**

United States Court of Appeals, Eleventh Circuit.

Feb. 24, 2010.

---

**2.** We deny Mora's request that this case be reassigned to a different judge on remand. Reassignment is unnecessary.

Aimee Ruth Buckman, Yardley Drake Buckman, II, Buckman & Buckman, P.A., Sarasota, FL, for Plaintiffs–Appellants.

Richard R. Garland, Dickinson & Gibbons, P.A., Nevin Alan Weiner, Nevin A. Weiner, P.A., Sarasota, FL, for Defendants–Appellees.

Before TJOFLAT and ANDERSON, Circuit Judges, and WOOD,* District Judge.

TJOFLAT, Circuit Judge:

■ In this case, Cynthia Coffin attempted to shut her open garage door to prevent two Sarasota County Sheriff's deputies, James Lutz and Stacy Brandau, from serving a court order on her husband, James Coffin.[1] Brandau stepped into the garage while the door was closing, breaking the electronic-eye safety beam on the garage door and causing the door to retreat to its open position. The Deputies, who did not possess a search or arrest warrant, entered the Coffins' garage and subsequently arrested Mrs. Coffin for obstruction of justice.[2] The Coffins sought damages against Lutz and Brandau under 42 U.S.C. § 1983 on the ground that the Deputies' warrantless entry into their garage and Mrs. Coffin's arrest violated their Fourth Amendment rights.[3] The Deputies contended that qualified immunity shields them from liability, and the district court agreed, granting them summary judgment. The court concluded that the Deputies had violated the Coffins' Fourth Amendment rights but were shielded by qualified immunity because the law governing "arrests at or just within the threshold of the house" was not clearly established until *McClish v. Nugent*, 483 F.3d 1231 (11th Cir.2007) was decided.

The Coffins now appeal the district court's judgment.[4] We do not treat this case as a threshold case; rather, we conclude that *United States v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), the leading Supreme Court case on curtilage, and its progeny control. Drawing on that precedent, we analyze whether the Deputies violated the Coffins' clearly established Fourth Amendment rights and conclude that because they did not, the Deputies are entitled to qualified immunity. We therefore affirm.

* Honorable Lisa Godbey Wood, United States District Judge for the Southern District of Georgia, sitting by designation.

1. For convenience, we sometimes refer to Lutz and Brandau collectively as "the Deputies."

2. Mr. Coffin was arrested in the Coffins' home on charges listed in note 7, *infra*, but his arrest is not a subject of this lawsuit.

3. 42 U.S.C. § 1983 provides, in relevant part, that

 [e]very person who, under color of [law] ... subjects ... any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

 Thus, a person bringing suit pursuant to 42 U.S.C. § 1983 must allege an underlying constitutional or statutory right that the official has violated. The underlying constitutional violation alleged by the Coffins is a Fourth Amendment violation. The Fourth Amendment applies to state and local governments under the Fourteenth Amendment's Due Process Clause. *See Oliver v. United States*, 466 U.S. 170, 187 n. 3, 104 S.Ct. 1735, 1746 n. 3, 80 L.Ed.2d 214 (1984) (noting that although the Bill of Rights, on its face, only applies to the federal government, the Fourteenth Amendment "subjects state and local governments to the most important of those restrictions," including the Fourth Amendment) (citing *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949)).

4. The district court entered a judgment consistent with its grant of the Deputies' motion for summary judgment on August 1, 2008. We have jurisdiction under 28 U.S.C. § 1291, which provides that "courts of appeals ... shall have jurisdiction of appeals from all final decisions of the district courts of the United States."

## I.

### A.

On April 18, 2006, at 6:30 p.m., Deputy James Lutz attempted to serve Mr. Coffin with an Order of Temporary Injunction Against Repeat Violence, which his tenant had obtained six days earlier from the Circuit Court for Charlotte County, Florida.[5] The injunction required Mr. Coffin to surrender any firearms or ammunition in his possession to the Sarasota County Sheriff and directed "[t]he Sheriff of Sarasota County, or any other authorized law enforcement officer ... to serve this temporary injunction ... as soon as possible after its issuance."

The Coffins' home is close to the sidewalk and has an attached, street-facing garage to the right of the front door with shrubs in between. Lutz approached the Coffin home and noticed that the garage door and the front bay window's curtains were open, allowing him to see inside the garage and home. It was still light outside. Lutz, clothed in his full uniform, rang the doorbell. Mrs. Coffin answered the door, and Lutz told her that he had important papers for Mr. Coffin.[6] Mrs. Coffin stated that he was in the bathroom, to which Lutz replied that he would wait. Mrs. Coffin shut and locked the door.

After waiting a few minutes, Lutz walked down the sidewalk to the bay window. Lutz could see Mrs. Coffin and he waved the paperwork over his head to get her attention. Lutz walked back to the door where he thought he overheard a man's voice asking, "What did he want?" Lutz rang the doorbell again but did not receive an answer. He walked through some bushes and went back to the front bay window, causing Mrs. Coffin to scream at him to get off of her property and to threaten to call the police. Lutz went back to the driveway in front of the garage, out of view of the window, where he called for backup because he believed the Coffins were avoiding service. Deputy Stacy Brandau arrived as backup five to eight minutes later.

Lutz explained to Brandau what had transpired. Lutz then saw Mr. Coffin through the front bay window. Brandau knocked on the door but received no answer. The Deputies were standing about five feet from the garage when Mrs. Coffin pushed an automatic button to shut her garage door. Seeing that the garage door was closing, Brandau stepped into the garage, breaking the electronic-eye safety beam for the door and causing the garage door to retreat to its open position. Lutz witnessed this act. Brandau entered the garage; Lutz followed. Brandau knocked on the interior door leading from the garage to the house. Mrs. Coffin opened the interior door and stepped into the garage, yelling at the Deputies to leave her property.

Mrs. Coffin initially approached Brandau because she felt "less frightened because she was a woman." After Mrs. Coffin told the Deputies that Mr. Coffin was not home, the Deputies told Mrs. Coffin she was going to jail and attempted to

---

5. The injunction had been issued by the Circuit Court of Sarasota County, pursuant to Fla. Stat. § 784.046. Section 784.046 allows a petitioner to obtain an "injunction for protection in cases of repeat violence" after "two incidents of violence or stalking [are] committed by the respondent, one of which must have been within 6 months of filing of the petition" against the petitioner or an immedi-

ate family member. Fla. Stat. § 784.046(1)(b), (2).

6. It is undisputed that Lutz was not certain that the woman who answered the door was Mrs. Coffin. Her actions that followed, however, gave him reason to believe that she was Mr. Coffin's wife.

handcuff her. Before they succeeded, Mr. Coffin came into the garage and hit Brandau. A struggle ensued in which Mr. Coffin attempted to pull his wife inside the house and the Deputies tried to keep her in the garage and arrest her. They all entered the kitchen, where a physical altercation between Mr. Coffin and the Deputies occurred. Additional deputies eventually arrived, and the Coffins were arrested.[7]

### B.

On May 15, 2007, as a result of these events, the Coffins instituted this action for damages under 42 U.S.C. § 1983, alleging that Deputies Brandau and Lutz, acting within their official capacities, violated their Fourth Amendment rights by illegally entering their garage and arresting Mrs. Coffin.[8] In their answers to the Coffins' complaint, the Deputies asserted the defense of qualified immunity. Following discovery, the parties filed cross-motions for summary judgment.

On July 31, 2008, the district court entered an order denying the Coffins' motion and granting the Deputies' motion, concluding that the Deputies were entitled to qualified immunity. The court held that the Deputies' warrantless entry into the Coffins' garage, which occurred absent consent or exigent circumstances, and Mrs. Coffin's subsequent arrest violated the Fourth Amendment. The court found, however, that the law did not fairly warn the Deputies that their warrantless entry of the garage would constitute a Fourth Amendment violation until our ruling in *McClish v. Nugent*, 483 F.3d 1231 (11th Cir.2007), decided after the incident at the Coffins'. As there was no clearly established law at the time of the Deputies' entrance, the court held, the Deputies could not have known whether their warrantless entry was a clear violation of the Coffins' rights; accordingly, the Deputies were entitled to qualified immunity.[9]

On August 7, 2008, the Coffins lodged this appeal challenging the district court's holding that no clearly established law provided fair warning to the Deputies that a warrantless entry into their garage under these circumstances constituted a Fourth Amendment violation.

### II.

■ "We review de novo a district court's grant of summary judgment based

---

7. Mrs. Coffin was charged with the misdemeanor of obstruction of justice without violence under Fla. Stat. § 843.02. Mr. Coffin was charged with several felonies: two counts of battery on a law enforcement officer under Fla. Stat. § 784.07(2)(b) and § 784.03(1); resisting an officer with violence under Fla. Stat. § 843.01; two counts of use of a weapon on a law enforcement officer under Fla. Stat. § 790.054; and depriving an officer of means of protection or communication under Fla. Stat. § 843.025. Because the Deputies lacked a warrant for Mr. Coffin's arrest, these charges, with the exception of the § 843.025 charge, were dropped. On March 13, 2007, Mr. Coffin pled no contest to that charge and was sentenced to six days' confinement. Meanwhile, the § 843.02 charge against Mrs. Coffin was dismissed.

8. The § 1983 relief the Coffins seek in their complaint is based on the Deputies' entrance into their garage and Mrs. Coffin's arrest. Their right to recovery turns on whether the garage constituted part of their home; if it did, then the entry was invalid (absent an exception to the warrant requirement) and Mrs. Coffin's subsequent arrest illegal. Therefore, the details of the altercation, which occurred after the entrance into the garage, are not relevant here.

9. The district court also held that Deputy Brandau, in effectuating Mrs. Coffin's arrest, had "at least arguable probable cause to believe that Mrs. Coffin was obstructing service of legal process pursuant to Florida law." *Coffin v. Brandau*, No. 07–cv–835–T–26TBM, 2008 WL 2950117, at *7 (M.D.Fla. July 31, 2008).

on qualified immunity and apply the same legal standards as the district court." *Bashir v. Rockdale County*, 445 F.3d 1323, 1326 (11th Cir.2006) (citing *Durruthy v. Pastor*, 351 F.3d 1080, 1084 (11th Cir. 2003)). We must resolve " 'all issues of material fact in favor of the plaintiff, and then determine the legal question of whether the defendant is entitled to qualified immunity under that version of the facts.' " *Id.* at 1327 (quoting *Durruthy*, 351 F.3d at 1084).

## III.

### A.

▇▇ The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).[10] This doctrine is intended to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, —— U.S. ——, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009).

▇▇ In *Saucier v. Katz*, the Supreme Court mandated a two-step process for lower courts to follow in resolving qualified immunity claims. 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). First, the court had to decide whether the facts that the plaintiff alleged showed a violation of a constitutional right. *Id.* Second, if the plaintiff satisfied the first step, the court had to determine whether

"the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 129 S.Ct. at 816 (quoting *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151).

▇▇ The Supreme Court revisited *Saucier*'s mandatory two-step inquiry in *Pearson*. *Id.* at 815–18. The Court held that while the *Saucier* process

> is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the court of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.

*Id.* at 818. Here, we find it appropriate to first address the clearly established prong. Finding that the Deputies did not violate a right of the Coffins' that was "clearly established," we are able to conclude the inquiry there.

### B.

▇▇ We find the relevant inquiry to be whether the Coffins had a Fourth Amendment right that was clearly established. We hold that they did not. "The critical inquiry is whether the law provided [the Deputies] with 'fair warning' that [their] conduct violated the Fourth Amendment." *McClish v. Nugent*, 483 F.3d 1231, 1248 (11th Cir.2007) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 2516, 153 L.Ed.2d 666 (2002)).

▇▇ The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Not all instances of officer trespassing amount to Fourth Amendment violations. *See, e.g.,*

---

**10.** The parties do not dispute that Brandau and Lutz were government officials performing discretionary duties within the scope of their employment.

*United States v. Dunn*, 480 U.S. 294, 304, 107 S.Ct. 1134, 1141, 94 L.Ed.2d 326 (1987) ("It follows that no constitutional violation occurred here when the officers crossed over respondent's ranch-style perimeter fence, and over several similarly constructed interior fences, prior to stopping at the locked front gate of the barn."). A "government[ ] intrusion" transforms from a trespass to a Fourth Amendment violation only when it "infringes upon the personal and societal values protected by the Fourth Amendment." *Oliver v. United States*, 466 U.S. 170, 182–83, 104 S.Ct. 1735, 1743, 80 L.Ed.2d 214 (1984). The touchstone of this analysis is whether a person enjoyed a " 'reasonable expectation of privacy' " associated with the intruded area. *Id.* at 177, 104 S.Ct. at 1740–41 (quoting *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)).

 An individual enjoys a reasonable expectation of privacy in his home.

The " 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 1379, 63 L.Ed.2d 639 (1980) (quoting *United States v. U.S. Dist. Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972)). The zone of privacy is most clearly defined "when bounded by the unambiguous physical dimensions of an individual's home." *Payton*, 445 U.S. at 589, 100 S.Ct. at 1382–83. *See also McClish*, 483 F.3d at 1241–42 ("The Court could not have more clearly defined the breadth of the Fourth Amendment's protection against warrantless in-home arrests—it created a firm line delimiting a zone of privacy defined by 'the unambiguous physical dimensions of an individual's home.' ") (quoting *Payton*, 445 U.S. at 589, 100 S.Ct. at 1382–83).

 Here, the entry at issue is the entry of the Coffins' garage.[11] A garage is

11. The district court held that the law at the time of the Deputies' entrance was not clearly established and did not provide the Deputies with "fair warning" that their conduct violated the Fourth Amendment. The district court reasoned "that without the benefit of *McClish v. Nugent*, 483 F.3d 1231 (11th Cir.2007), which was decided ... almost one year after the incident, the deputies could not have known whether entering the garage without a warrant was clearly a violation of the Coffins' constitutional rights." *Coffin v. Brandau*, No. 07–cv–835–T–26TBM, 2008 WL 2950117, at *7 (M.D.Fla. July 31, 2008). *McClish* addressed the question of whether a person who voluntarily opens his front door could be removed from his home and arrested outside the home's threshold in light of *Payton v. New York*, 445 U.S. 573, 589–90, 100 S.Ct. 1371, 1381–82, 63 L.Ed.2d 639 (1980) (holding that absent exigent circumstances, an arrest within the home can only be effectuated with a warrant; probable cause is insufficient) and *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) (holding that Santana, who had been standing in the door-

way to her home, could not retreat into her house to thwart an otherwise proper arrest, citing hot pursuit).

In *McClish*, we held that "[t]he Fourth Amendment, as interpreted by *Payton* and its progeny, does not permit an officer to ... forcibly remove a citizen from his home absent an exigency or consent" to effectuate an arrest. 483 F.3d at 1242. The officer had therefore violated McClish's Fourth Amendment rights. We opined, however, that the violation was not "so clearly established" as to strip the officer of "the qualified immunity customarily granted [to] law enforcement officers engaged in the discretionary performance of their official duties." *Id.* at 1248. Because the Supreme Court, Eleventh Circuit, or Florida Supreme Court had not "resolved the question whether *Payton* or *Santana* applies to the arrest of a person who, while standing firmly inside the house, opens the door in response to a knock from the police and is then pulled outside the unambiguous physical dimensions of the home," we had "no basis to conclude that a reasonable law enforcement officer fairly would have *known*

not included within the unambiguous physical dimensions of an individual's home; rather, a garage enjoys the protections of the home only if it constitutes curtilage. *See Dunn,* 480 U.S. at 300, 107 S.Ct. 1134; *see also id.* at 307–08, 107 S.Ct. at 1143 ("[T]he general rule is that the '[c]urtilage includes all outbuildings used in connection with a residence, such as garages, sheds, [and] *barns* ... connected with and in close vicinity of the residence.'") (Brennan, J., dissenting) (quoting *Luman v. Oklahoma,* 629 P.2d 1275, 1276 (Okla. Crim.App.1981)). In *Oliver,* the Supreme Court adopted the distinction at common law between curtilage, which is "considered part of [the] home itself for Fourth Amendment purposes," and open fields, which do not enjoy Fourth Amendment protection. 466 U.S. at 180, 104 S.Ct. at 1742. As at common law, curtilage is defined "by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." *Id.*

In *Dunn,* the Supreme Court set forth four factors to assist in the "task of defining the extent of a home's curtilage." 480 U.S. at 301, 107 S.Ct. at 1139. The four factors are

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the

uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*Id.* The third factor, the nature of the uses to which the area is put, addresses whether the claimed curtilage is "used for intimate activities of the home." *Id.* at 302, 107 S.Ct. at 1140. If the garage was "so associated with the activities and privacies of domestic life," it should be "deemed ... as part of [the Coffins'] home." *Id.*

Here, it is not clear that the garage constituted curtilage.[12] The first factor, the proximity to the home, supports the garage constituting curtilage because the garage is attached to the home. Finding no evidence that there was an enclosure surrounding the home, the second *Dunn* factor does not point in either direction.

The third and fourth *Dunn* factors, however, weigh strongly against the garage constituting curtilage when the Deputies arrived. When the Deputies arrived, there was still daylight. The Coffins did not take steps to protect the interior of the garage from the observation of people passing by. Both cars were in the driveway and the garage door was open. Mrs. Coffin agreed that "[i]t would be fair to say that until the moment [she] pushed the control to shut the overhead door, ... the interior of the garage was visible from the

---

that the arrest alleged by McClish, within the house yet within [the] reach of an officer standing outside, was unlawful." *Id.* at 1249.

*McClish* therefore addresses the issue of whether a person removed from his home by officers can be arrested at the threshold of his home. We do not construe the present case as a "threshold" case. The question that this case presents is whether the Coffins' garage constituted curtilage. Whether the Deputies' entrance of the garage and Mrs. Coffin's arrest amounted to a Fourth Amendment violation turns squarely on the curtilage issue.

There is no argument that the Coffins were removed from their home's threshold to effectuate an arrest; the events at issue occurred within the unambiguous boundaries of the garage or home. As even the district court acknowledges, "no 'threshold' issue ever arose." Therefore, we do not believe that *McClish* has any bearing on whether the rights in this case were clearly established.

**12.** Had the garage door been closed upon the Deputies' arrival, the garage would have clearly constituted curtilage.

street."[13] Under these circumstances, we cannot say it is clear that the Coffins' garage enjoyed Fourth Amendment protections. Moreover, there is no evidence in the record that the garage was being used for intimate purposes when the Deputies arrived. The Coffins were not inside the garage, and when questioned about the contents of the garage, Mrs. Coffin replied that it contained "[t]oo much. Motorcycle, lawn mower, a bike, a couple bikes, toolboxes." These items do not suggest that the sanctity that we credit a home should extend to the Coffins' garage.

 Mrs. Coffin attempted to close the garage door. Brandau's act of tripping the electronic-eye beam, the Deputies' subsequent entry to the garage[14] without a warrant, and Mrs. Coffin's subsequent arrest may have violated the Coffins' Fourth Amendment rights, but the relevant inquiry here is whether the Deputies violated a clearly established right. The parties agree that there is no prior case with these facts. "Although exact factual identity with a previously decided case is not required, the conduct must have been clearly unlawful in light of pre-existing law." *McClish*, 483 F.3d at 1248 (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002)). The Coffins do not cite, and we cannot find, a Supreme Court, Eleventh Circuit, or Florida Supreme Court case that would put the Deputies on sufficient notice that a garage with an open door would constitute curtilage or became curti-

lage when Mrs. Coffin made clear her intention to shut the garage door.[15] Therefore, we conclude that their "conduct was not so clearly established as to justify stripping [them] of qualified immunity." *McClish*, 483 F.3d at 1249.

## IV.

For the foregoing reasons, we affirm the district court's judgment for Deputies Lutz and Brandau on the basis of qualified immunity.

AFFIRMED.

WOOD, District Judge, dissenting:

I agree with the majority that the right of the Coffins to recover turns on whether the garage constituted part of their home. I dissent because I conclude that the Coffins' garage was a part of their home and that the warrantless entry into the home violated clearly established Fourth Amendment rights such that qualified immunity does not shield the Defendants.

The Fourth Amendment draws a firm line of protection around "the unambiguous physical dimensions of an individual's home." *Payton v. New York*, 445 U.S. 573, 589, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Pursuant to Supreme Court precedent, an attached garage sits within those protected dimensions. In *Kyllo v. United States*, the Supreme Court held that a thermal-imaging scan of a home that re-

---

13. The garage faced the street and parallel sidewalk. Although the record does not indicate the precise distance between the garage door and the sidewalk and street, a photograph of the front of the house and garage shows that it is within 50 feet of the sidewalk and street.

14. As noted, Lutz witnessed Brandau trip the electronic-eye beam to prevent the garage door from closing.

15. In a Sixth Circuit case, the court likewise found that defendants were entitled to qualified immunity because "the law defining curtilage remains unclear." *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 603 (6th Cir. 1998). The Sixth Circuit was, however, put on notice that going forward, the police would be precluded "from relying on qualified immunity as a defense to warrantless searches of garages" similar to those in *Daughenbaugh*. *Id.*

vealed heat emanating from an attached garage violated the Fourth Amendment's ban on warrantless searches of the home. 533 U.S. 27, 40, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). The Court did not afford less protection to the attached garage than it gave to other areas of the home. In fact, the evidence at issue was obtained from the scan of the attached garage. ·*Id.* at 30. The high Court's framing of the issue shows that it treated the garage as part of the home: "This case presents the question whether the use of a thermal-imaging device aimed at a private home from a public street to detect relative amounts of heat within the home constitutes a 'search' within the meaning of the Fourth Amendment." *Kyllo,* 533 U.S. at 29, 121 S.Ct. 2038. The "relative amounts of heat" detected were of the attached garage compared to "the rest of the home." *Kyllo,* 533 U.S. at 30, 121 S.Ct. 2038.

*Kyllo* was not the first case in which the Supreme Court indicated that an attached or adjacent garage is part of the home. The Court held in *Taylor v. United States,* 286 U.S. 1, 5–6, 52 S.Ct. 466, 76 L.Ed. 951 (1932), that a warrantless search of an "adjacent" garage violated the Fourth Amendment. In so holding, the Court stated that "[t]he garage—a small metal building—is on the corner of a city lot and adjacent to the dwelling in which petitioner Taylor resided. *The two houses are parts of the same premises.*" *Id.* at 5, 52 S.Ct. 466 (emphasis added). The Supreme Court also indicated that a garage is part of the home in *Chimel v. California,* when the Court stated that "the officers then looked through the entire three-bedroom house, including the attic, the garage, and a small workshop." 395 U.S. 752, 754, 89

S.Ct. 2034, 23 L.Ed.2d 685 (1969). The Court held that the search of the home incident to arrest beyond the petitioner's grab area violated the Fourth Amendment, and reversed the petitioner's conviction. *Id.* at 768, 89 S.Ct. 2034. Pursuant to *Kyllo, Taylor* and *Chimel,* an attached garage is part of the home.

In the present case, it is undisputed that the Coffins' garage is attached and is incorporated into the contiguous exterior masonry walls of the home. The Coffins' garage is "part[ ] of the same premises" as the rest of their home. *Taylor,* 286 U.S. at 5, 52 S.Ct. 466. It is therefore clearly established that the Coffins' attached garage is part of their home for Fourth Amendment purposes.

Because the Supreme Court has established that an attached garage is a part of the home, it is not necessary to resort to factors set forth in *United States v. Dunn,* 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), which guide in distinguishing between an open field and curtilage. The majority grounds its decision that a garage is either curtilage or an open field, rather than part of the home itself, on the following passage from the *Dunn* dissent: "the general rule is that the '[c]urtilage includes all outbuildings used in connection with a residence, such as garages, sheds, [and] barns ... connected with and in close vicinity of the residence.'" *Dunn,* 480 U.S. at 307–08, 107 S.Ct. 1134 (Brennan, J., dissenting) (quoting *Luman v. Oklahoma,* 629 P.2d 1275, 1276 (Okla.Crim.App.1981)). However, both Justice Brennan's dissent and the Oklahoma Court of Criminal Appeals decision from which he was quoting were merely giving examples of curtilage—not differentiating between curtilage and the home itself.[1] The full quote from

---

1. Both *Dunn* and *Luman* involved actual fields, not outbuildings. The issue in *Dunn* was whether a field surrounding the respon- dent's barn was an open field or part of the home's curtilage. *Dunn,* 480 U.S. at 303–04, 107 S.Ct. 1134. The Court assumed without

the Oklahoma Court of Criminal Appeals opinion clarifies that point: "Curtilage includes all outbuildings used in connection with a residence, such as garages, sheds, barns, yards and lots connected with[2] and in close vicinity of the residence, but open pasture and wooded area beyond fenced residential property does not constitute part of curtilage." *Luman,* 629 P.2d at 1276.

The majority opinion in *Dunn,* however, does provide some indirect support for the conclusion that an attached garage is part of the home. As explained in *Dunn:*

> In defining the terms "mansion or dwelling house," Blackstone wrote that "no distant barn, warehouse, or the like are under the same privileges, nor looked upon as a man's castle of defence . . . ." 4 W. Blackstone, Commentaries *225. Blackstone observed, however, that "if the barn, stable, or warehouse, be parcel of the mansion-house, and within the same common fence, *though not under the same roof or contiguous,* a burglary may be committed therein; for the capital house protects and privileges all its branches and appurtenances, if within the curtilage or homestall."

*Dunn,* 480 U.S. at 300 n. 3, 107 S.Ct. 1134 (emphasis added). Blackstone was writing about a home's curtilage as it pertained to the law of burglary, from which Fourth Amendment curtilage law originated. *See id.* at 300, 107 S.Ct. 1134 ("The curtilage concept originated at common law to ex-

tend to the area immediately surrounding a dwelling house the same protection under the law of burglary as was afforded the house itself.").

Thus, under the common law, a "dwelling" consisted of the home and all areas contiguous with it or under the same roof, and a dwelling's curtilage included the area within the same enclosure as the dwelling. *See id.; Martinez v.' Florida,* 700 So.2d 142, 143 (Fla.Dist.Ct.App.1997). Florida still adheres to the common law rule in the burglary context: an attached garage is always considered a dwelling, but a detached garage is only considered a dwelling if other factors are present. *See McAllister v. State,* 859 So.2d 611, 612 (Fla.Dist.Ct.App.2003) ("[U]nless [the] garage was either attached to the house or enclosed substantially along with the house, appellant is guilty of burglary of a structure, not burglary of a dwelling."); *Martinez,* 700 So.2d at 144 (reversing a conviction for burglary of a dwelling because the garage was not attached to the home).

Modern curtilage law has evolved "to include land and structures near enough to a dwelling to deserve the dwelling's protection," even if the area is not enclosed by a fence. *Martinez,* 700 So.2d at 143. Because American courts no longer required an enclosure for an area to lie within a home's curtilage, they had to undertake more detailed factual inquiries to make that determination. To that end, the Su-

---

deciding that the "barn enjoyed Fourth Amendment protection and could not be entered and its contents seized without a warrant." *Id.* at 303, 107 S.Ct. 1134. The Court ultimately held that the field at issue was an open field, which the majority defined as "any unoccupied or undeveloped area outside of the curtilage." *Id.* at 304, 107 S.Ct. 1134 (internal quotation marks omitted). The issue in *Luman,* the case from which Justice Brennan quoted, was whether the appellants'

cornfield was curtilage or an open field. *Luman,* 629 P.2d at 1276.

**2.** The phrase "connected with" denotes an affinity of usage, not a physical connection. If the Court intended the connection to be physical, it would have written "connected to." Moreover, the phrase "connected with" cannot mean physically attached, because that would render the further description "in close vicinity" completely redundant.

preme Court set forth four factors in *Dunn* to aid courts in determining whether an area should enjoy the same protection "as the home itself." 480 U.S. at 300–01, 107 S.Ct. 1134. The *Dunn* Court cautioned that the factors it identified "are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id.* at 301, 107 S.Ct. 1134. Resort to those factors is unnecessary when dealing with a garage attached to the home, as areas "under the same roof or contiguous" with the home have always enjoyed protection. *See id.* at 300 n. 3, 107 S.Ct. 1134 (quoting 4 W. Blackstone, Commentaries *225).

As the majority notes, the Sixth Circuit stated that the "law defining curtilage remains unclear" in *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 603 (6th Cir.1998). I agree with the majority and the Sixth Circuit that the law of curtilage was not clearly defined as it pertained to the detached garage at issue in *Daughenbaugh*. The garage in *Daughenbaugh* was detached and located fifty to sixty yards from the home, did not have a working door, and was in serious disrepair. *Id.* at 596. In cases such as the present, where the garage is physically attached or adjacent to the home, cases such as *Kyllo* and *Payton* clearly establish that a warrant is required.[3]

Accordingly, I disagree with the majority's analysis seeking to determine whether an attached garage is curtilage as opposed to an open field. Rather, I would hold

that an attached garage is neither an open field nor curtilage; it is part of the home.

Because I would hold that the attached garage is a part of the home, I disagree with the majority that considerations of whether intimate activities occurred therein, and whether the door had been open at times, could remove the Fourth Amendment protections. Neither the level of intimacy of activities within the garage, nor the fact that the officers were able to gain entry before Ms. Coffin completed her efforts to shut the garage door, can remove the Fourth Amendment protections afforded to the Coffins inside their home.

When dealing with the home itself, considerations of whether an area is put to intimate use and the intrusiveness of the invasion are irrelevant. *See Kyllo*, 533 U.S. at 34–36, 121 S.Ct. 2038; *Payton*, 445 U.S. at 589–90, 100 S.Ct. 1371; *Silverman v. United States*, 365 U.S. 505, 511–12, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). People enjoy reasonable expectations of privacy in their homes even if they do not shield the inside of their homes from public view and their activities therein do not meet a narrow definition of "intimate." *See Kyllo*, 533 U.S. at 37, 121 S.Ct. 2038 ("In the home ... *all* details are intimate details ....") (emphasis in original).

Nor are the *Payton* and *Kyllo* rules dependent on the steps individuals take to shield the activities of the insides of their homes from public view. Absent exigent circumstances, the police cannot enter a suspect's home and make an arrest after spotting the suspect through an open door or window: they must get a warrant. *Payton*, 445 U.S. at 589–90, 100 S.Ct. 1371.

---

**3.** *See, e.g., United States v. Oaxaca*, 233 F.3d 1154, 1157 (9th Cir.2000) (holding that an attached garage is part of the home for *Payton* purposes even when the garage door is open); *United States v. Cota–Lopez*, 358 F.Supp.2d 579, 590 (W.D.Tex.2002) ("The

[c]ourt agrees with [d]efendants that the attached [open] garage is part of the [r]esidence, and as a consequence, it is entitled to the same Fourth Amendment protection as the remainder of the residence.").

The police in *Payton* did not violate the defendant's constitutional rights when they *looked through* an open door and saw the defendant; they violated the defendant's constitutional rights when they *walked through* the open door and arrested him. *Id.* at 578, 589–90, 100 S.Ct. 1371 ("When his young son opened the door, they could see [the defendant] sitting in bed covered by a sheet. They entered the house and placed him under arrest."). The Deputies in the present case did the same when they chose not to follow Ms. Coffin's request to "get off [her] property" and proceeded, instead, to enter the garage as Ms. Coffin was trying to close the garage door.

The majority concludes that the Defendants are entitled to qualified immunity because no Supreme Court, Eleventh Circuit, or Florida Supreme Court case has ruled that a garage with an open door is curtilage and not an open field. I would deny qualified immunity because the Supreme Court has ruled that an attached garage is part of the home. Accordingly, a warrant is required to enter the home, even if the activities therein are not strictly·intimate and even if the door has not completely closed.