[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 08-14538
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 22, 2010
JOHN LEY
CLERK

D. C. Docket No. 07-00835-CV-T-26-TBM

JOHN COFFIN,
CYNTHIA COFFIN,

Plaintiffs-Appellants,

versus

STACY BRANDAU,
individually,
f.k.a. Stacy Ferris,
JAMES LUTZ,
individually,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 22, 2010)

**ON PETITION FOR PANEL REHEARING**

Before TJOFLAT and ANDERSON, Circuit Judges, and WOOD,[*] District Judge.

TJOFLAT, Circuit Judge:

The previous opinions issued in this case, <u>John Coffin v. Stacy Brandau</u>, 597 F.3d 1205, (11th Cir., February 24, 2010), are hereby VACATED. In their place, on petition for panel rehearing, we file these revised opinions. The petition for panel rehearing is otherwise DENIED.

In this case, Cynthia Coffin attempted to shut her open garage door to prevent two Sarasota County Sheriff's deputies, James Lutz and Stacy Brandau, from serving a court order on her husband, James Coffin.[1] Brandau stepped into the garage while the door was closing, breaking the electronic-eye safety beam on the garage door and causing the door to retreat to its open position. The Deputies, who did not possess a search or arrest warrant, entered the Coffins' garage and subsequently arrested Mrs. Coffin for obstruction of justice.[2] The Coffins sought damages against Lutz and Brandau under 42 U.S.C. § 1983 on the ground that the Deputies' warrantless entry into their garage and Mrs. Coffin's arrest violated their

---

[*] Honorable Lisa Godbey Wood, United States District Judge for the Southern District of Georgia, sitting by designation.

[1] For convenience, we sometimes refer to Lutz and Brandau collectively as "the Deputies."

[2] Mr. Coffin was arrested in the Coffins' home on charges listed in note 7, <u>infra</u>, but his arrest is not a subject of this lawsuit.

2

Fourth Amendment rights.[1]  The Deputies contended that qualified immunity

shields them from liability, and the district court agreed, granting them summary

judgment.  The court concluded that the Deputies had violated the Coffins' Fourth

Amendment rights but were shielded by qualified immunity because the law

governing "arrests at or just within the threshold of the house" was not clearly

established until McClish v. Nugent, 483 F.3d 1231 (11th Cir. 2007), was decided.

The Coffins now appeal the district court's judgment.[4]  We do not treat this

case as a threshold case, but nonetheless agree that the Deputies did not violate the

Coffins' clearly established Fourth Amendment rights and conclude that the

---

[1]  42 U.S.C. § 1983 provides, in relevant part, that

[e]very person who, under color of [law] . . . subjects . . . any citizen of the United
States or other person within the jurisdiction thereof to the deprivation of any
rights, privileges, or immunities secured by the Constitution and laws, shall be
liable to the party injured in an action at law, suit in equity, or other proper
proceeding for redress.

Thus, a person bringing suit pursuant to 42 U.S.C. § 1983 must allege an underlying
constitutional or statutory right that the official has violated.  The underlying constitutional
violation alleged by the Coffins is a Fourth Amendment violation.  The Fourth Amendment
applies to state and local governments under the Fourteenth Amendment's Due Process Clause.
See Oliver v. United States, 466 U.S. 170, 187 n.3, 104 S. Ct. 1735, 1746 n.3, 80 L. Ed. 2d 214
(1984) (noting that although the Bill of Rights, on its face, only applies to the federal
government, the Fourteenth Amendment "subjects state and local governments to the most
important of those restrictions," including the Fourth Amendment) (citing Wolf v. Colorado, 338
U.S. 25, 69 S. Ct. 1359, 93 L. Ed. 1782 (1949)).

[4]  The district court entered a judgment consistent with its grant of the Deputies' motion
for summary judgment on August 1, 2008.  We have jurisdiction under 28 U.S.C. § 1291, which
provides that "courts of appeals . . . shall have jurisdiction of appeals from all final decisions of
the district courts of the United States."

3

Deputies are entitled to qualified immunity.  We therefore affirm.

## I.

### A.

On April 18, 2006, at 6:30 p.m., Deputy James Lutz attempted to serve Mr. Coffin with an Order of Temporary Injunction Against Repeat Violence, which his tenant had obtained six days earlier from the Circuit Court for Charlotte County, Florida.[5]  The injunction required Mr. Coffin to surrender any firearms or ammunition in his possession to the Sarasota County Sheriff and directed "[t]he Sheriff of Sarasota County, or any other authorized law enforcement officer . . . to serve this temporary injunction . . . as soon as possible after its issuance."

The Coffins' home is close to the sidewalk and has an attached, street-facing garage to the right of the front door with shrubs in between.  Lutz approached the Coffin home and noticed that the garage door and the front bay window's curtains were open, allowing him to see inside the garage and home.  It was still light outside.  Lutz, clothed in his full uniform, rang the doorbell.  Mrs. Coffin answered

---

[5]  The injunction had been issued by the Circuit Court of Sarasota County, pursuant to Fla. Stat. § 784.046.  Section 784.046 allows a petitioner to obtain an "injunction for protection in cases of repeat violence" after "two incidents of violence or stalking [are] committed by the respondent, one of which must have been within 6 months of filing of the petition" against the petitioner or an immediate family member.  Fla. Stat. § 784.046(1)(b), (2).

the door, and Lutz told her that he had important papers for Mr. Coffin.[6] Mrs. Coffin stated that he was in the bathroom, to which Lutz replied that he would wait. Mrs. Coffin shut and locked the door.

After waiting a few minutes, Lutz walked down the sidewalk to the bay window. Lutz could see Mrs. Coffin and he waved the paperwork over his head to get her attention. Lutz walked back to the door where he thought he overheard a man's voice asking, "What did he want?" Lutz rang the doorbell again but did not receive an answer. He walked through some bushes and went back to the front bay window, causing Mrs. Coffin to scream at him to get off of her property and to threaten to call the police. Lutz went back to the driveway in front of the garage, out of view of the window, where he called for backup because he believed the Coffins were avoiding service. Deputy Stacy Brandau arrived as backup five to eight minutes later.

Lutz explained to Brandau what had transpired. Lutz then saw Mr. Coffin through the front bay window. Brandau knocked on the door but received no answer. The Deputies were standing about five feet from the garage when Mrs. Coffin pushed an automatic button to shut her garage door. Seeing that the garage

___

[6] It is undisputed that Lutz was not certain that the woman who answered the door was Mrs. Coffin. Her actions that followed, however, gave him reason to believe that she was Mr. Coffin's wife.

door was closing, Brandau stepped into the garage, breaking the electronic-eye safety beam for the door and causing the garage door to retreat to its open position. Lutz witnessed this act. Brandau entered the garage; Lutz followed. Brandau knocked on the interior door leading from the garage to the house. Mrs. Coffin opened the interior door and stepped into the garage, yelling at the Deputies to leave her property.

Mrs. Coffin initially approached Brandau because she felt "less frightened because she was a woman." After Mrs. Coffin told the Deputies that Mr. Coffin was not home, the Deputies told Mrs. Coffin she was going to jail and attempted to handcuff her. Before they succeeded, Mr. Coffin came into the garage and hit Brandau. A struggle ensued in which Mr. Coffin attempted to pull his wife inside the house and the Deputies tried to keep her in the garage and arrest her. They all entered the kitchen, where a physical altercation between Mr. Coffin and the Deputies occurred. Additional deputies eventually arrived, and the Coffins were arrested.[7]

---

[7] Mrs. Coffin was charged with the misdemeanor of obstruction of justice without violence under Fla. Stat. § 843.02. Mr. Coffin was charged with several felonies: two counts of battery on a law enforcement officer under Fla. Stat. § 784.07(2)(b) and § 784.03(1); resisting an officer with violence under Fla. Stat. § 843.01; two counts of use of a weapon on a law enforcement officer under Fla. Stat. § 790.054; and depriving an officer of means of protection or communication under Fla. Stat. § 843.025. Because the Deputies lacked a warrant for Mr. Coffin's arrest, these charges, with the exception of the § 843.025 charge, were dropped. On March 13, 2007, Mr. Coffin pled no contest to that charge and was sentenced to six days' confinement. Meanwhile, the § 843.02 charge against Mrs. Coffin was dismissed.

B.

On May 15, 2007, as a result of these events, the Coffins instituted this action for damages under 42 U.S.C. § 1983, alleging that Deputies Brandau and Lutz, acting within their official capacities, violated their Fourth Amendment rights by illegally entering their garage and arresting Mrs. Coffin.[8]  In their answers to the Coffins' complaint, the Deputies asserted the defense of qualified immunity. Following discovery, the parties filed cross-motions for summary judgment.

On July 31, 2008, the district court entered an order denying the Coffins' motion and granting the Deputies' motion, concluding that the Deputies were entitled to qualified immunity.  The court held that the Deputies' warrantless entry into the Coffins' garage, which occurred absent consent or exigent circumstances, and Mrs. Coffin's subsequent arrest violated the Fourth Amendment.  The court found, however, that the law did not fairly warn the Deputies that their warrantless entry of the garage would constitute a Fourth Amendment violation until our ruling in McClish v. Nugent, 483 F.3d 1231 (11th Cir. 2007), decided after the incident at the Coffins'.  As there was no clearly established law at the time of the Deputies'

---

[8]  The § 1983 relief the Coffins seek in their complaint is based on the Deputies' entrance into their garage and Mrs. Coffin's arrest.  Their right to recovery turns on whether the garage constituted part of their home; if it did, then the entry was invalid (absent an exception to the warrant requirement) and Mrs. Coffin's subsequent arrest illegal.  Therefore, the details of the altercation, which occurred after the entrance into the garage, are not relevant here.

entrance, the court held, the Deputies could not have known whether their warrantless entry was a clear violation of the Coffins' rights; accordingly, the Deputies were entitled to qualified immunity.[9]

On August 7, 2008, the Coffins lodged this appeal challenging the district court's holding that no clearly established law provided fair warning to the Deputies that a warrantless entry into their garage under these circumstances constituted a Fourth Amendment violation.

## II.

"We review de novo a district court's grant of summary judgment based on qualified immunity and apply the same legal standards as the district court." Bashir v. Rockdale County, 445 F.3d 1323, 1326 (11th Cir. 2006) (citing Durruthy v. Pastor, 351 F.3d 1080, 1084 (11th Cir. 2003)). We must resolve "'all issues of material fact in favor of the plaintiff, and then determine the legal question of whether the defendant is entitled to qualified immunity under that version of the facts.'" Id. at 1327 (quoting Durruthy, 351 F.3d at 1084).

## III.

### A.

---

[9] The district court also held that Deputy Brandau, in effectuating Mrs. Coffin's arrest, had "at least arguable probable cause to believe that Mrs. Coffin was obstructing service of legal process pursuant to Florida law." Coffin v. Brandau, No. 07-cv-835-T-26TBM, 2008 WL 2950117, at *7 (M.D. Fla. July 31, 2008).

8

The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982).[10] This doctrine is intended to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, __ U.S. __, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009).

In Saucier v. Katz, the Supreme Court mandated a two-step process for lower courts to follow in resolving qualified immunity claims. 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). First, the court had to decide whether the facts that the plaintiff alleged showed a violation of a constitutional right. Id. Second, if the plaintiff satisfied the first step, the court had to determine whether "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Pearson, __ U.S. at __, 121 S. Ct. at 816 (quoting Saucier, 533 U.S. at 201).

The Supreme Court revisited Saucier's mandatory two-step inquiry in

---

[10] The parties do not dispute that Brandau and Lutz were government officials performing discretionary duties within the scope of their employment.

9

Pearson. Id. at __, 129 S. Ct. at 815–18. The Court held that while the Saucier process

> is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the court of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.

Id. at 818. Here, we find it appropriate to first address the clearly established prong. Finding that the Deputies did not violate a right of the Coffins' that was "clearly established," we are able to conclude the inquiry there.

B.

We find the relevant inquiry to be whether the Coffins had a Fourth Amendment right that was clearly established. We hold that they did not. "The critical inquiry is whether the law provided [the Deputies] with 'fair warning' that [their] conduct violated the Fourth Amendment." McClish v. Nugent, 483 F.3d 1231, 1248 (11th Cir. 2007) (quoting Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516, 153 L. Ed. 2d 666 (2002)). "[I]n the light of pre-existing law the unlawfulness [of their conduct] must be apparent." Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

seizures." U.S. Const. amend. IV. Not all instances of officer trespassing amount to Fourth Amendment violations. See, e.g., United States v. Dunn, 480 U.S. 294, 304, 107 S. Ct. 1134, 1141, 94 L. Ed. 2d 326 (1987) ("It follows that no constitutional violation occurred here when the officers crossed over respondent's ranch-style perimeter fence, and over several similarly constructed interior fences, prior to stopping at the locked front gate of the barn."). A "government[] intrusion" transforms from a trespass to a Fourth Amendment violation only when it "infringes upon the personal and societal values protected by the Fourth Amendment." Oliver v. United States, 466 U.S. 170, 182–83, 104 S. Ct. 1735, 1743, 80 L. Ed. 2d 214 (1984). The touchstone of this analysis is whether a person enjoyed a "'reasonable expectation of privacy'" associated with the intruded area. Id. at 177, 104 S.Ct. at 1740–41 (quoting Katz v. United States, 389 U.S. 347, 360, 88 S. Ct. 507, 516, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring)).

Here, the entry at issue is the entry of the Coffins' garage. To strip the Deputies of qualified immunity, the Coffins must have had a clearly established Fourth Amendment right to be free from a warrantless entry of their garage or warrantless arrest therein. This right could be clearly established in two ways. The first way is if it is clearly established that the garage was part of the Coffins' home.

11

An individual enjoys a reasonable expectation of privacy in his home. The "'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" Payton v. New York, 445 U.S. 573, 585, 100 S. Ct. 1371, 1379, 63 L. Ed. 2d 639 (1980) (quoting United States v. U.S. Dist. Court, 407 U.S. 297, 313, 92 S. Ct. 2125, 2134, 32 L. Ed. 2d 752 (1972)). The zone of privacy is most clearly defined "when bounded by the unambiguous physical dimensions of an individual's home." Payton, 445 U.S. at 589, 100 S. Ct. at 1382–83. See also McClish, 483 F.3d at 1241–42 ("The Court could not have more clearly defined the breadth of the Fourth Amendment's protection against warrantless in-home arrests—it created a firm line delimiting a zone of privacy defined by 'the unambiguous physical dimensions of an individual's home.'") (quoting Payton, 445 U.S. at 589, 100 S. Ct. at 1382–83).

We reject this first possibility because it is not clearly established that an entry of a garage—even when attached to the home—is the same as an entry of the home. Put another way, we have found no Supreme Court,[11] Eleventh Circuit,[12] or

---

[11] The dissent posits that the Supreme Court's decision in Kyllo v. United States, 533 U.S. 27, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001), clearly establishes that an attached garage is part of the home. In Kyllo, the Court held that information from a thermal imager scan "show[ing] that the roof over the garage and a side wall of petitioner's home were relatively hot compared to the rest of the home" was obtained in violation of the Fourth Amendment. Id. at 30, 121 S. Ct. at 2041. Based on this information, agents suspected Kyllo was growing marijuana, obtained a search warrant, and found an indoor growing operation. The issue of whether the garage constituted part of the home, however, was not before the Court. No party argued to the court that the garage should be treated differently than the home, and the Court did not address

12

Florida Supreme Court case clearly establishing that an attached garage is part of

the unambiguous physical dimensions of an individual's home. Without such a

decision, we would only deny the Deputies qualified immunity under this first

possibility if "it would be clear to every reasonable officer, even in the absence of

case law," that the garage enjoyed the Fourth Amendment protections given to

the issue. In fact, the only mention of the word "garage" in the entire opinion is in the previously quoted sentence, which appeared in the court's description of the facts. It can hardly be argued that this one mention is sufficient to put a reasonable official on notice that an attached garage is unambiguously part of the home, especially because the thermal imager intrusion at issue involved not only the roof of the garage, but also the "side wall of the petitioner's home." Significantly, the analysis in the opinion focused solely on the home; a violation was found because the "thermal imager reveal[ed] the relative heat of various rooms in the home," which constituted "information regarding the interior of the home." Id. at 35 n.2. There is no suggestion that the result in the case would have been the same had the search only involved the garage—particularly if the garage were open.

[12] The former Fifth Circuit found a Fourth Amendment violation when an officer, while arresting a suspect, saw a number of stacked air conditioner units in a garage, suspected they were stolen, and entered the garage to record the air conditioners' serial numbers. United States v. Sokolow, 450 F.2d 324, 325 (5th Cir. 1971). In Bonner v. City of Prichard, 661 F. 2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981. The mere fact that the court found the presence of a Fourth Amendment violation in Sokolow, however, does not mean that the case stands for the proposition that an attached garage is necessarily part of a home. In its brief per curiam opinion, the court did not explain how it reached its conclusion that the garage was worthy of Fourth Amendment protection, nor was the garage itself described. The specific facts of a case that purportedly clearly established a right are important. Sanders v. Howze, 177 F.3d 1245, 1250 (11th Cir. 1999). "'For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances.'" Id. (quoting Lassiter v. Ala. A & M Univ. Bd. of Trs., 28 F.3d 1146, 1150 (11th Cir.1994) (en banc)). Given the absence of a statement that an attached garage is part of the home and the scant recitation of the facts and analysis in Sokolow, it cannot be said that Sokolow made it "sufficiently clear" to every reasonable official that entering any attached garage to conduct a search or make an arrest without a warrant or applicable exception violates the Fourth Amendment. See Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987).

13

homes.  See Oliver v. Fiornio, 586 F. 3d 898, 907 (11th Cir. 2009).  We do not think this is the case; there is certainly a colorable argument that reasonable persons treat garages differently than homes.  For example, when there is an open garage, revealing to passers-by the contents of the garage, and a door providing access to the residence, it is conceivable that a delivery person might enter the garage, knock on the door to the residence, and/or leave items to be delivered.  But that same delivery person would not feel comfortable entering the home without permission, even if the front door were open.

The second way we could find that the Deputies violated a clearly established right of the Coffins is if it is clearly established that the garage constituted curtilage.[13]  In Oliver v. United States, the Supreme Court adopted the

---

[13]  The district court held that the law at the time of the Deputies' entrance was not clearly established and did not provide the Deputies with "fair warning" that their conduct violated the Fourth Amendment.  The district court reasoned "that without the benefit of McClish v. Nugent, 483 F.3d 1231 (11th Cir. 2007), which was decided . . . almost one year after the incident, the deputies could not have known whether entering the garage without a warrant was clearly a violation of the Coffins' constitutional rights."  Coffin v. Brandau, No. 07-cv-835-T-26TBM, 2008 WL 2950117, at *7 (M.D. Fla. July 31, 2008).  McClish addressed the question of whether a person who voluntarily opens his front door could be removed from his home and arrested outside the home's threshold in light of Payton v. New York, 445 U.S. 573, 589–90, 100 S. Ct. 1371, 1381–82, 63 L. Ed. 2d 639 (1980) (holding that absent exigent circumstances, an arrest within the home can only be effectuated with a warrant; probable cause is insufficient) and United States v. Santana, 427 U.S. 38, 96 S. Ct. 2406, 49 L. Ed. 2d 300 (1976) (holding that Santana, who had been standing in the doorway to her home, could not retreat into her house to thwart an otherwise proper arrest, citing hot pursuit).
    In McClish, we held that "[t]he Fourth Amendment, as interpreted by Payton and its progeny, does not permit an officer to . . . forcibly remove a citizen from his home absent an exigency or consent" to effectuate an arrest.  483 F.3d at 1242.  The officer had therefore violated McClish's Fourth Amendment rights.  We opined, however, that the violation was not

14

distinction at common law between curtilage, which is "considered part of [the] home itself for Fourth Amendment purposes," and open fields, which do not enjoy Fourth Amendment protection. 466 U.S. at 180, 104 S. Ct. at 1742. As at common law, curtilage is defined "by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." Id.

In Dunn, the Supreme Court set forth four factors to assist in the "task of defining the extent of a home's curtilage." 480 U.S. at 301, 107 S. Ct. at 1139. The four factors are

the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the

---

"so clearly established" as to strip the officer of "the qualified immunity customarily granted [to] law enforcement officers engaged in the discretionary performance of their official duties." Id. at 1248. Because the Supreme Court, Eleventh Circuit, or Florida Supreme Court had not "resolved the question whether Payton or Santana applies to the arrest of a person who, while standing firmly inside the house, opens the door in response to a knock from the police and is then pulled outside the unambiguous physical dimensions of the home," we had "no basis to conclude that a reasonable law enforcement officer fairly would have known that the arrest alleged by McClish, within the house yet within [the] reach of an officer standing outside, was unlawful." Id. at 1249.

McClish therefore addresses the issue of whether a person removed from his home by officers can be arrested at the threshold of his home. We do not construe the present case as a "threshold" case. The question that this case presents is whether the Coffins' garage was entitled to Fourth Amendment protection either because it was part of the home or because it constituted curtilage. There is no argument that the Coffins were removed from their home's threshold to effectuate an arrest; the events at issue occurred within the unambiguous boundaries of the garage or home. As even the district court acknowledges, "no 'threshold' issue ever arose." Therefore, we do not believe that McClish has any bearing on whether the rights in this case were clearly established.

15

resident to protect the area from observation by people passing by. Id. The third factor, the nature of the uses to which the area is put, addresses whether the claimed curtilage is "used for intimate activities of the home." Id. at 302, 107 S. Ct. at 1140. If the garage was "so associated with the activities and privacies of domestic life," it should be "deemed . . . as part of [the Coffins'] home." Id.

Here, it is not clear that the garage constituted curtilage.[14] The first factor, the proximity to the home, supports the garage constituting curtilage because the garage is attached to the home. Finding no evidence that there was an enclosure surrounding the home, the second Dunn factor does not point in either direction.

The third and fourth Dunn factors, however, weigh strongly against the garage constituting curtilage when the Deputies arrived. When the Deputies arrived, there was still daylight. The Coffins did not take steps to protect the interior of the garage from the observation of people passing by. Both cars were in the driveway and the garage door was open. Mrs. Coffin agreed that "[i]t would be fair to say that until the moment [she] pushed the control to shut the overhead door, . . . the interior of the garage was visible from the street."[15] Under these

---

[14] Had the garage door been closed upon the Deputies' arrival, the garage would have clearly constituted curtilage.

[15] The garage faced the street and parallel sidewalk. Although the record does not indicate the precise distance between the garage door and the sidewalk and street, a photograph

16

circumstances, we cannot say it is clear that the Coffins' garage enjoyed Fourth Amendment protections.  Moreover, there is no evidence in the record that the garage was being used for intimate purposes when the Deputies arrived.  The Coffins were not inside the garage, and when questioned about the contents of the garage, Mrs. Coffin replied that it contained "[t]oo much.  Motorcycle, lawn mower, a bike, a couple bikes, toolboxes."  These items do not suggest that the sanctity that we credit a home should extend to the Coffins' garage.

Mrs. Coffin attempted to close the garage door.  Brandau's act of tripping the electronic-eye beam, the Deputies' subsequent entry to the garage[16] without a warrant, and Mrs. Coffin's subsequent arrest may have violated the Coffins' Fourth Amendment rights, but the relevant inquiry here is whether the Deputies violated a clearly established right.  The parties agree that there is no prior case with these facts.  "Although exact factual identity with a previously decided case is not required, the conduct must have been clearly unlawful in light of pre-existing law." McClish, 483 F.3d at 1248 (citing Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002)).  The Coffins do not cite, and we cannot find, a Supreme Court, Eleventh Circuit, or Florida Supreme Court case that would put the Deputies on

_____

of the front of the house and garage shows that it is within 50 feet of the sidewalk and street.

[16]  As noted, Lutz witnessed Brandau trip the electronic-eye beam to prevent the garage door from closing.

17

sufficient notice that a garage with an open door would constitute curtilage or became curtilage when Mrs. Coffin made clear her intention to shut the garage door.[17]

In sum, we hold that it is not clearly established either that the Coffins' garage was part of their home or that it constituted curtilage. Therefore, we conclude that the Deputies' "conduct was not so clearly established as to justify stripping [them] of qualified immunity." McClish, 483 F.3d at 1249.

IV.

For the foregoing reasons, we affirm the district court's judgment for Deputies Lutz and Brandau on the basis of qualified immunity.

AFFIRMED.

---

[17] In a Sixth Circuit case, the court likewise found that defendants were entitled to qualified immunity because "the law defining curtilage remains unclear." Daughenbaugh v. City of Tiffin, 150 F.3d 594, 603 (6th Cir. 1998). The Sixth Circuit was, however, put on notice that going forward, the police would be precluded "from relying on qualified immunity as a defense to warrantless searches of garages" similar to those in Daughenbaugh. Id.

WOOD, District Judge, dissenting:

I agree with the majority that the right of the Coffins to recover turns on whether the garage constituted part of their home. I dissent because I conclude that the Coffins' garage was a part of their home and that the warrantless entry into the home violated clearly established Fourth Amendment rights such that qualified immunity does not shield the Defendants.

The Fourth Amendment draws a firm line of protection around "the unambiguous physical dimensions of an individual's home." Payton v. New York, 445 U.S. 573, 589, 100 S. Ct. 1371 (1980). Pursuant to Supreme Court precedent, an attached garage sits within those protected dimensions. In Kyllo v. United States, the Supreme Court held that a thermal-imaging scan that revealed heat emanating from a home's attached garage violated the Fourth Amendment's ban on warrantless searches of the home. 533 U.S. 27, 40, 121 S. Ct. 2038 (2001). The Court did not afford less protection to the attached garage than it gave to other areas of the home. In fact, the heat evidence at issue was obtained from the scan of the attached garage. Id. at 30. The high Court's framing of the issue shows that it treated the garage as part of the home: "This case presents the question whether the use of a thermal-imaging device aimed at a private home from a public street to detect relative amounts of heat within the home constitutes a 'search' within the

19

meaning of the Fourth Amendment." Id. at 29. The "relative amounts of heat" detected were of the attached garage compared to "the rest of the home." Id. at 30.

Kyllo was not the first case in which the Supreme Court indicated that an attached or adjacent garage is part of the home. The Court held in Taylor v. United States, that a warrantless search of an "adjacent" garage violated the Fourth Amendment. 286 U.S. 1, 5-6, 52 S. Ct. 466 (1932). In so holding, the Court stated that "[t]he garage – a small metal building – is on the corner of a city lot and adjacent to the dwelling in which petitioner Taylor resided. *The two houses are parts of the same premises*." Id. at 5 (emphasis added). The Supreme Court also indicated that a garage is part of the home in Chimel v. California, when the Court stated that "the officers then looked through the entire three-bedroom house, including the attic, the garage, and a small workshop." 395 U.S. 752, 754, 89 S. Ct. 2034 (1969). The Court held that the search of the home incident to arrest beyond the petitioner's grab area violated the Fourth Amendment, and reversed the petitioner's conviction. Id. at 768. Pursuant to Kyllo, Taylor, and Chimel, it is clearly established that an attached garage is part of the home.

The former Fifth Circuit has held the same. In United States v. Sokolow, the former Fifth Circuit held that a police officer's warrantless search of the defendant's garage to record the serial numbers of air-conditioning units the officer

20

suspected were stolen violated the Fourth Amendment. 450 F.2d 324, 325 (5th Cir. 1971).[1] Applying the same legal analysis as it would had the officer entered any other part of the defendant's home without a warrant, the court held that there were no exigent circumstances to justify the warrantless entry of the garage because the air-conditioning units could not have been disposed of easily and other officers were maintaining surveillance on the premises. Id.; see also Kauz v. United States, 95 F.2d 473, 474 (5th Cir. 1938) (holding that a warrantless search of a garage that was part of the same building as the defendant's living quarters violated the Fourth Amendment).

In the present case, it is undisputed that the Coffins' garage is attached and is incorporated into the contiguous exterior masonry walls of the home. The Coffins' garage is "part[] of the same premises" as the rest of their home. Taylor, 286 U.S. at 5. It is therefore clearly established that the Coffins' attached garage is part of their home for Fourth Amendment purposes. Additionally, it is undisputed that there were no exigent circumstances.

In footnote eleven, the majority offers four reasons for its position that Kyllo does not clearly establish that an attached garage is part of a home. The majority first notes that no party in Kyllo challenged whether the garage should be treated

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

21

like "the rest of the home." If such a failure to challenge by <u>Kyllo</u> counsel is assigned any import at all, it would be to strengthen the conclusion that treating the garage like "the rest of the home" is clearly established. Moreover, a right becomes clearly established based on what the Supreme Court writes, not what the parties argue. Furthermore, the <u>Kyllo</u> Court and litigants were not operating on a blank slate. The Supreme Court's holding in <u>Taylor</u> that a warrantless search of an adjacent garage violated the Fourth Amendment had been settled law for nearly seventy years. <u>Id.</u>

Second, the majority finds <u>Kyllo</u> less than clear because the word "garage" is only mentioned once in the fact section of the opinion to establish the location of the relative hot spots. It is true that throughout the remainder of the opinion the high court uses the terms "home" and "house" to describe the hot spots. Such usage strengthens, rather than weakens, the conclusion that it is clearly established that an attached garage is part of the home.

Third, the majority posits that there were two hot spots at issue and that one may not have been associated with the garage. However, the only hot spots identified in <u>Kyllo</u> were the roof over the garage and "the side wall of [the] home," which was one of the garage walls.[2]

---

[2] <u>Kyllo</u>, 533 U.S. at 30. The scan showed hot spots only on the roof over the garage and the sidewall of the garage. <u>Kyllo</u>, 533 U.S. 27, app; Brief for Petitioner at 2, <u>Kyllo</u>, 533 U.S. 27 (2001) (No. 99-8508), 2000 WL 33127872; Brief for the United States at 4, <u>Kyllo</u>, 533 U.S. 27

Finally, the majority states that the result in <u>Kyllo</u> may have been different if the garage door had been open.  <u>Payton</u> squarely forecloses that reasoning.  In <u>Payton</u>, the police saw the defendant through an open door, walked through the open door, and arrested him.  <u>Payton</u>, 445 U.S. at 578 ("When his young son opened the door, [the police] could see [the defendant] sitting in bed covered by a sheet.  They entered the house and placed him under arrest.").  The police in <u>Payton</u> did not violate the defendant's constitutional rights when they *looked through* the open door and saw the defendant; they violated the defendant's constitutional rights when they *walked through* the open door and arrested him. <u>Id.</u> at 589-90.  The deputies in the present case did the same when they chose not to follow Ms. Coffin's request to "get off [her] property" and, instead, entered the garage as Ms. Coffin was closing the door and arrested her.

Granted, <u>Payton</u> did not involve a garage, but <u>Kyllo</u> did.  And because <u>Kyllo</u> held that a garage is part of the home, <u>Payton</u> applies.  Because <u>Payton</u> applies, the fact that the door was open is irrelevant.   People enjoy reasonable expectations of privacy in their homes even if they do not shield the inside of their homes from public view.  Absent exigent circumstances, Lutz and Brandau could not enter the Coffins' attached garage and arrest them after spotting them through an open door;

_____

(2001) (No. 99-8508), 2000 WL 1890949.

23

they had to get a warrant.  See id.  Moreover, the garage door in the present case was not simply open when the officers entered.  Prior to their entry, Ms. Coffin had demanded that they leave.  She shut and locked the front door and was in the process of shutting the garage door when Officer Brandau prevented it from closing by tripping the electronic beam.  As Brandau entered the garage, Ms. Coffin repeated her demand that the officers "get off [her] property."  Under Payton, it is clear that a homeowner whose door is open is entitled to protection.  It is no less, and arguably more, clear that a homeowner actively trying to close a door to prevent the police from a warrantless entry is entitled to protection.

Because the Supreme Court has established that an attached garage is a part of the home, it is not necessary to resort to the factors set forth in United States v Dunn, 480 U.S. 294, 107 S. Ct. 1134 (1987), which guide in distinguishing between an open field and curtilage.  Dunn involved an actual field.  The issue in Dunn was whether a field surrounding the respondent's barn was an open field or part of the home's curtilage.  Id. at 303-04.  The Court assumed without deciding that the "barn enjoyed Fourth Amendment protection and could not be entered and its contents seized without a warrant."  Id. at 303.  The Court ultimately held that the field at issue was an open field, which the majority defined as "any unoccupied or undeveloped area outside of the curtilage."  Id. at 304 (internal quotation marks

24

omitted).

The Dunn opinion does provide some indirect support for the conclusion

that an attached garage is part of the home.  As explained in Dunn:

> In defining the terms "mansion or dwelling house," Blackstone
> wrote that "no distant barn, warehouse, or the like are under the
> same privileges, nor looked upon as a man's castle of
> defence. . . ."  4 W. Blackstone, Commentaries *225.
> Blackstone observed, however, that "if the barn, stable, or
> warehouse, be parcel of the mansion-house, and within the
> same common fence, *though not under the same roof or
> contiguous*, a burglary may be committed therein; for the
> capital house protects and privileges all its branches and
> appurtenances, if within the curtilage or homestall."

Id. at 300 n.3 (emphasis added).  Blackstone was writing about a home's curtilage

as it pertained to the law of burglary, from which Fourth Amendment curtilage law

originated.  See id. at 300 ("The curtilage concept originated at common law to

extend to the area immediately surrounding a dwelling house the same protection

under the law of burglary as was afforded the house itself.").

Thus, under the common law, a "dwelling" consisted of the home and all

areas contiguous with it or under the same roof, and a dwelling's curtilage included

the area within the same enclosure as the dwelling.  See id.; Martinez v. State, 700

So. 2d 142, 143 (Fla. Dist. Ct. App. 1997).  Florida still adheres to the common

law rule in the burglary context:  an attached garage is always considered a

dwelling, but a detached garage is only considered a dwelling if other factors are

25

present.  See McAllister v. State, 859 So. 2d 611, 612 (Fla. Dist. Ct. App. 2003) ("[U]nless [the] garage was either attached to the house or enclosed substantially along with the house, appellant is guilty of burglary of a structure, not burglary of a dwelling."); Martinez, 700 So. 2d at 144 (reversing a conviction for burglary of a dwelling because the garage was not attached to the home).

Modern curtilage law has evolved "to include land and structures near enough to a dwelling to deserve the dwelling's protection," even if the area is not enclosed by a fence.  Martinez, 700 So. 2d at 143.  Because American courts no longer required an enclosure for an area to lie within a home's curtilage, they had to undertake more detailed factual inquiries to make that determination.  To that end, the Supreme Court set forth four factors in Dunn to aid courts in determining whether an area should enjoy the same protection "as the home itself."  480 U.S. at 300-01.  The Dunn Court cautioned that the factors it identified "are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration – whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection."  Id. at 301.  Resort to those factors is unnecessary when dealing with a garage attached to the home, as areas "under the same roof or contiguous" with the home have always enjoyed protection.  See id. at 300 n.3

26

(quoting William Blackstone, 4 Commentaries *225).

As the majority notes, the Sixth Circuit stated that the "law defining curtilage remains unclear" in Daughenbaugh v. City of Tiffin, 150 F.3d 594, 603 (6th Cir. 1998). I agree with the majority and the Sixth Circuit that the law of curtilage was not clearly defined as it pertained to the detached garage at issue in Daughenbaugh. The garage in Daughenbaugh was detached and located fifty to sixty yards from the home, did not have a working door, and was in serious disrepair. Id. at 596. In cases such as the present, however, where the garage is physically attached or adjacent to the home, cases such as Kyllo and Payton clearly establish that a warrant is required.[3]

Accordingly, I disagree with the majority's analysis seeking to determine whether an attached garage is curtilage as opposed to an open field. Rather, I would hold that it is clearly established that an attached garage is neither an open field nor curtilage; it is part of the home.

Because I would hold that the attached garage is a part of the home, I disagree with the majority that considerations of whether intimate activities

---

[3] See, e.g., United States v. Oaxaca, 233 F.3d 1154, 1157 (9th Cir. 2000) (holding that an attached garage is part of the home for Payton purposes even when the garage door is open); United States v. Cota-Lopez, 358 F. Supp. 2d 579, 590 (W.D. Tex. 2002) ("The [c]ourt agrees with [d]efendants that the attached [open] garage is part of the [r]esidence, and as a consequence, it is entitled to the same Fourth Amendment protection as the remainder of the residence. It is well established that the Fourth Amendment's protection is extended to garages.").

27

occurred therein could remove the Fourth Amendment protections. When dealing with the home itself, considerations of whether an area is put to intimate use and the intrusiveness of the invasion are irrelevant. See Kyllo, 533 U.S. at 34-36; Payton, 445 U.S. at 589-90; Silverman v. United States, 365 U.S. 505, 511-12, 81 S. Ct. 679 (1961). People enjoy reasonable expectations of privacy in their homes even if they do not shield the inside of their homes from public view and their activities therein do not meet a narrow definition of "intimate." See Kyllo, 533 U.S. at 37 ("In the home . . . *all* details are intimate details . . . .") (emphasis in original).

The majority concludes that the Defendants are entitled to qualified immunity because no Supreme Court, Eleventh Circuit, or Florida Supreme Court case has ruled that a garage with an open door is part of the home or curtilage as opposed to an open field. I would deny qualified immunity because the Supreme Court has ruled that an attached garage is part of the home. Accordingly, a warrant is required to enter the home, even if the activities therein are not strictly intimate and even if the door has not completely closed.